UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────

SUSAN AMY SCHLENGER,

                              Plaintiff,

                                                        09-CV-3986 (CS)
            - against -

                                                        **DECISION
FIDELITY EMPLOYER SERVICES COMPANY, LLC,                AND ORDER**
IBM CORPORATION, and METROPOLITAN LIFE
INSURANCE COMPANY,

                              Defendants.

───────────────────────────────────────────

<u>Appearances</u>:

Nicole B. Albano
Lowenstein Sandler, PC
Roseland, New Jersey
*Counsel for Plaintiff*

Alyson M. Weiss
Tal E. Dickstein
Loeb & Loeb LLP
New York, New York
*Counsel for Defendant Fidelity Employer Services Company, LLC*

Allan S. Bloom
Emily R. Pidot
Erin E. Laruffa
Paul, Hastings, Janofsky & Walker LLP
New York, New York
*Counsel for Defendant IBM Corporation*

Michael H. Bernstein
John T. Seybert
Sedgwick, Detert, Moran & Arnold LLP
New York, New York
*Counsel for Defendant Metropolitan Life Insurance Company*

Seibel, J.

Before the Court are several motions.  First, Defendant Metropolitan Life Insurance Company ("MetLife") moves for summary judgment dismissing the First, Second, Third, and Fourth Causes of Action in Plaintiff Susan Schlenger's Amended Complaint, (Doc. 12), the only causes of action that pertain to MetLife, and for summary judgment on MetLife's Counterclaim. (Doc. 42.)

Second, Defendant Fidelity Employer Services Company ("Fidelity") moves for summary judgment dismissing the Second and Fourth Causes of Action in Plaintiff's Amended Complaint, the only causes of action that pertain to Fidelity, and for an award of its attorneys' fees and costs.  (Doc. 47.)

Third, Defendant International Business Machines Corporation ("IBM") moves to dismiss the Fifth and Sixth Causes of Action in Plaintiff's Amended Complaint, the only causes of action that pertain to it, for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), and failure to plead with particularity pursuant to Federal Rule of Civil Procedure 9(b). (Doc. 32.)

Plaintiff Susan Amy Schlenger opposes all three motions, (Docs. 36, 52, 55), and cross-moves for summary judgment on her claims against MetLife, and for an award of her attorney's fees and costs.  (Doc. 58).

For the reasons stated herein, MetLife's Motion for Summary Judgment is GRANTED, Plaintiff's Cross-Motion for Summary Judgment on her claims against MetLife is DENIED; Plaintiff's motion for an award of attorney's fees and costs is DENIED; Fidelity's Motion for Summary Judgment is GRANTED; Fidelity's motion for an award of attorney's fees and costs is DENIED; and IBM's Motion to Dismiss is GRANTED, but Plaintiff has leave to amend as to her claims against IBM only.

## I.      BACKGROUND

For purposes of deciding IBM's Motion, I assume the facts (but not the conclusions) as alleged in the Amended Complaint to be true, and for purposes of deciding MetLife's and Fidelity's Motions for Summary Judgment, as well as Plaintiff's Cross-Motion for Summary Judgment, the following facts are undisputed, except where noted.  While I will only briefly summarize the facts, I have read and considered all of the allegations in the Amended Complaint, and for purposes of the summary judgment motions, the materials provided in connection with those motions, and I assume the parties' familiarity with them.

Plaintiff is an attorney who previously resided and practiced in Massachusetts.  (Am. Compl. ¶¶ 30, 31.)  She was recruited by representatives of IBM starting in October 2003 to work in its Business and Government Relations Division as a Senior Contracts Professional at its facility in Yorktown, New York.[1]  (*Id.* at ¶ 32.)  Plaintiff alleges that during the recruitment process, IBM representatives represented to her that if she worked for IBM, she would receive "variable pay constituting an average 10% of her base salary annually," plus a "robust relocation package that would allow her to relocate her family from Massachusetts to New York to a home suitable to her needs."  (*Id.* at ¶ 33.)  Plaintiff claims that based on these representations she decided to accept IBM's offer, (*id.* at ¶ 34), and relocate her family to New York, (*id.* at ¶ 35), but ran into difficulties with the relocation allegedly because of IBM's failure to provide her with the "promised relocation plan," inasmuch as the allegedly revised package she received "had no provision for an equity advance to provide a down payment on a new house," (*id.* at ¶¶ 35–36).  As a result of this delay and revision, Plaintiff states that by the time the corrected plan was issued in April 2004, she had expended approximately $15,000 for temporary housing, (*id.* at ¶

---

[1]  The Amended Complaint states that the recruitment began in 2007, but as Defendant points out, the rest of the Amended Complaint's allegations indicate the proper date was 2003.

37), lost the opportunity to bid on a suitable house for her family, (*id.* at ¶ 35), and was ultimately compelled to bid on a "more expensive house that failed to meet many of her criteria and that was located 20 miles further away from work," (*id.* at ¶ 38).

Plaintiff states that she complained of her frustrations with the relocation process to her then-manager, Ronald Rinner, who had also been her "hiring manager," and his director, Joyce Koontz, who had "dined Ms. Schlenger during the recruiting process and confirmed the commitments made by Mr. Rinner." (*Id.* at ¶ 40.) Plaintiff contends that she continued to have significant out-of-pocket expenses related to selling her prior residence (a farm) because the agent provided by IBM was inexperienced selling farm properties, and that by the time of her relocation from the temporary apartment in which she had been residing around late July or early August 2004, Ms. Schlenger had spent nearly $30,000 in rent and associated costs for the apartment, and was "forced to spend an additional $15,000 on out-of-pocket transportation and travel expenses, child care expenses, and substitute labor," an amount in excess of the $11,000 lump sum relocation package that IBM had given her. (*Id.* at ¶ 43.)

In the meantime, Plaintiff had started working at IBM on December 1, 2003, as a Senior Contracts Professional in the Contracts and Negotiations Division. (*Id.* at ¶ 44.) Plaintiff maintains that during her time at IBM she "possessed a stellar work record and . . . had received exceptionally good performance ratings," but despite this never received the 10% variable pay promised to her during the hiring process or any other compensation increases whatsoever. (*Id.* at ¶ 46.)

Plaintiff's medical problems began around May 30, 2005, when she alleges that she began to suffer "excruciating and intractable back pain." (*Id.* at ¶ 48.) She was admitted to the

hospital on or about May 31, 2005[2] and treated with pain medication.  (*Id.*; ML 56.1 ¶ 8; Pl.'s 56.1 (ML) ¶ 8; Hallford Decl. Ex. B at SCH 652.)[3]  Plaintiff advised the doctors at Vassar Brothers Hospital of various past injuries, including neck and residual spinal problems from a car accident in 1969, and injuries from falling from a horse in and around 1995.  (ML 56.1 ¶¶ 9–10; Pl.'s 56.1 (ML) ¶¶ 9–10.)  Plaintiff had a history of back complaints, and a prior history of depression.  (SCH 652–55; ML 56.1 ¶¶ 12–13; Pl.'s 56.1 (ML) ¶¶ 12–13.)

After this first hospitalization she requested and was denied a more flexible work schedule.  (Am. Compl. ¶ 49.)  Plaintiff was hospitalized a second time in November 2005, at which time she was diagnosed with progressive Facet disease ("a disorder of certain joints associated with the spine").  (*Id.* at ¶ 51.)  Plaintiff also has been diagnosed with progressive cervical stenosis, chronic intractable back pain, related right shoulder weakness and pain, a Tarlov cyst (a fluid-filled sac in spinal canal), and coccydynia (pain of the tailbone).  (*Id.* at ¶¶ 51, 52.)  At that time, "with management's approval and endorsement," Plaintiff began to work from home, an option apparently available to any employee regardless of health.  (*Id.* at ¶¶ 53, 54.)  Plaintiff alleges that she continued her work from her home, taking frequent, intermittent rest when needed in light of her condition and her medications.  (*Id.* at ¶¶ 55, 60.)  Plaintiff contends that she maintained fifty-plus hour work weeks during this period and "was able to perform at a level similarly productive to her pre-June 2005 levels," but "was unable to successfully maintain a course of prescribed medication or treatment to address her pain levels due to IBM's continued refusal to allow her genuine flex hours."  (*Id.* at ¶¶ 58, 60.)

---

[2] The Amended Complaint alleges that Plaintiff was admitted to the hospital on June 1, 2005; the parties' statements pursuant to Local Rule 56.1 indicate that she was admitted to the hospital on May 30, 2005, (MetLife's Local Rule 56.1 Statement of Material Facts, (Doc. 44) ("ML 56.1") ¶ 8; Plaintiff's Local Rule 56.1 Counterstatement/ Supplemental Statement in Opposition to MetLife's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment, (Doc. 56) ("Pl.'s 56.1 (ML)") ¶ 8), and the administrative record indicates that she was admitted May 31, 2005, (Declaration of Matthew Hallford, (Doc. 45) ("Hallford Decl.") Ex. B at 652).

[3] The administrative record relevant here was submitted to the Court as Exhibit B to the Declaration of Matthew Hallford, (Doc. 45), and is labeled SCHLENGER 000080–945.  All references thereto are cited as SCH ###.

In 2005 and 2006, Plaintiff submitted Medical Treatment Reports ("MTR's") to IBM. Plaintiff's first MTR was submitted by Daniel Richman, M.D.  (ML 56.1 ¶¶ 14–16; Pl.'s 56.1 (ML) ¶¶ 14–16; SCH 723.)  The remainder of Plaintiff's MTRs were submitted by Ricardo Cruciani, M.D., Ph.D. (ML 56.1 ¶ 17; Pl.'s 56.1 (ML) ¶ 17; SCH 722, 724–29.)  Dr. Cruciani diagnosed plaintiff with degenerative disc disease ("DDD"), Facet's disease, cervical stenosis and spondylosis.[4]  (ML 56.1 ¶ 18; Pl.'s 56.1 (ML) ¶ 18.)

Plaintiff was hospitalized for a third time in mid-March 2006 for further diagnosis and treatment, and upon discharge continued to work from home.  (Am. Compl. ¶¶ 61, 62.)  In August 2006, Dr. Cruciani requested that IBM provide a proof-reader to assist plaintiff in reviewing her work for typographical errors.  (ML 56.1 ¶ 24; Pl.'s 56.1 (ML) ¶ 24.)  Plaintiff alleges that beginning around mid-May 2006, her supervisor, Gary Lipson, commenced a "six month harassment campaign" that involved "an unusual and uncustomary review process out of yearly order and out of synch with IBM's procedural precedent."  (Am. Compl. ¶¶ 63, 64.)

According to Plaintiff, the culmination of this alleged campaign was "an arbitrary determination" by Lipson that Plaintiff "was too acutely 'ill' to work given her symptoms related to global spinal disorders and other conditions."  (*Id.* at ¶ 63.)  Plaintiff maintains that as a result she was effectively dismissed on November 14, 2006, and did not return to work after that date. (*Id.* at ¶¶ 63, 67.)  Specifically, Plaintiff claims that she was "forced out" of her job in November 2006, and that her supervisor claimed that Plaintiff had "performance problems" and felt that she would "not get better."  (ML 56.1 ¶¶ 26–27; Pl.'s 56.1 (ML) ¶¶ 26–27, 30.)  According to MetLife, Plaintiff stopped working due to an alleged physical disability caused by Facet's disease and cervical stenosis.  (ML 56.1 ¶ 30; Pl.'s 56.1 (ML) ¶ 30.)

---

[4] Spondylosis is a term referring to age-related wear and tear affecting neck disks.  Mayo Clinic, http:www.mayoclinic.com/health/cervical-spondylosis/DS00697 (last visited Mar. 29, 2011).

In response to Lipson's decision (and perhaps to the off-cycle review, although the Amended Complaint does not specify), Plaintiff appealed to IBM's Human Resources Department, which undertook an internal investigation to determine whether his actions were discriminatory.  (Am. Compl. ¶ 64.)  According to Plaintiff, the investigation characterized Lipson's conduct as "merely being 'isolated incidents' of discrimination without a pattern thereto," although Plaintiff argues that Lipson's decision was "unjustified in light of Ms. Schlenger's stellar work record, above-par performance ratings throughout her tenure, and performance of upwards of fifty-plus hours per week."  (*Id.* at ¶¶ 65, 66; *see* ML's 56.1 ¶ 28 (Plaintiff's performance reports indicate that Plaintiff was "strong overall" through end of December 2005).)  Plaintiff also alleges that IBM's Human Resources Department was "complacent [*sic*] in Mr. Lipson's conduct."  (Am. Compl. ¶ 67.)  After her dismissal, Plaintiff claims that she was placed on "long-term disability or 'active, unpaid' employee status until [IBM] made efforts to terminate her based upon her inability to obtain medical clearance . . . ."  (*Id.* ¶ 68.)

IBM offers its employees various employee benefits plans, including medical and dental insurance, group life insurance, and both short-term disability ("STD") and long-term disability ("LTD") insurance (collectively, the "IBM Plans"), all of which are governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  (Fid. 56.1 ¶ 1;[5] Pl.'s 56.1 (Fid) ¶ 1.[6])  IBM's LTD Plan identifies the "Manager of U.S. Benefits Services, IBM Human Resources" as the "Plan Administrator," and lists the address of the Plan Administrator as "Office of the Plan Administrator, IBM Employee Services Center, 5411 Page Road, Durham, NC 27703."

---

[5] "Fid. 56.1" refers to Defendant Fidelity's Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment.  (Doc. 48.)
[6] "Pl.'s 56.1 (Fid)" refers to Plaintiff's Rule 56.1 Counter-Statement and Supplemental Statement of Material, Undisputed Facts in Opposition to Fidelity's Motion for Summary Judgment.  (Doc. 54.)

(Hallford Decl. Ex. A at SCH 077; ML 56.1 ¶ 6.)  MetLife issued to IBM a group policy of insurance to fund benefits payable under the LTD Plan, and "was granted full discretionary authority to administer claims for benefits under the Plan, including the authority to make all benefit determinations under the plan."  (ML 56.1 ¶ 5; Pl.'s 56.1 (ML) ¶ 5; Hallford Decl. Ex. A at SCH 023–24.)  IBM's health care and life insurance plans are sponsored and maintained by IBM, and name a committee of IBM executives as the "Plan Administrator."  (Fid. 56.1 ¶¶ 2–3; Pl.'s 56.1 (Fid) ¶¶ 2–3.)  Pursuant to a Human Resources Services Agreement, dated June 27, 2002, which was amended and restated by an Administrative Service Agreement, dated August 1, 2007, "certain human resource and employee service operations and functions" related to the IBM Plans were "performed and managed" by Fidelity.  (Fid. 56.1 ¶ 10; Pl.'s 56.1 (Fid) ¶ 10; Dickstein Decl.[7] Ex. 4 at 1, Ex. 5.)  For instance, Fidelity (i) made available phone representatives, known as the IBM Employee Service Center ("ESC"), which IBM Plan participants could contact for help with "enrollment, general benefits information and questions," and (ii) provided access to a website, www.netbenefits.com, which allows IBM Plan participants to obtain Plan information and perform transactions related to their coverage under the IBM Plans.  (Fid. 56.1 ¶¶ 11–12; Pl.'s 56.1 (Fid) ¶¶ 11–12.)

As a result of her employment with IBM, Plaintiff was eligible for and enrolled in the IBM LTD Plan.  (ML 56.1 ¶ 4; Pl.'s 56.1 (ML) ¶ 4.)  According to Plaintiff, she made a claim for STD benefits following November 2006.  (Am. Compl. ¶ 69.)  Plaintiff's STD application was approved, and Plaintiff received STD benefits through March 13, 2007.  (ML 56.1 ¶ 32; Pl.'s 56.1 (ML) ¶ 32.)  After exhaustion of the STD benefits, Plaintiff was eligible to apply for LTD benefits if she remained "disabled."  IBM's LTD plan states that:

---

[7] "Dickstein Decl." refers to the Declaration of Tal E. Dickstein in Support of Fidelity's Motion for Summary Judgment.  (Doc. 49.)

"[D]isabled" means that during the first 12 months after you complete the elimination period, you cannot perform the important duties of your regular occupation with IBM because of a sickness or injury.  After expiration of that 12 month period, disabled means that because of sickness or injury, you cannot perform the important duties of any other gainful occupation for which you are reasonably fit by your education, training and experience.

(Hallford Decl. Ex. A at 014–15; ML 56.1 ¶ 36; Pl.'s 56.1 (ML) ¶ 36.)[8]

On December 21, 2006, Plaintiff applied for LTD benefits.  (ML 56.1 ¶ 39; Pl.'s 56.1 (ML) ¶ 39.)  On the claim form, Plaintiff stated that she was unable to perform the important duties of her job on a regular basis due to "[f]requent hospitalizations," that "absences due to pain interrupt[ed] [her] job detrimentally," and that "[u]nique stress exacerbated [her] condition." (SCH 936.)  Plaintiff's LTD application also indicated that she was unable to perform the duties of "some other job" on a regular basis, and that "[a]ny job [she] was able to take would need to be home based and flexible in terms of frequent absences," and that "stress/personal conflict would need to be minimal."  (*Id.*)  Plaintiff listed eight physicians who had treated her since the beginning of her disability.  (SCH 937.)  Plaintiff did not submit records to MetLife from three of the doctors.  (ML 56.1 ¶¶ 90–93; Pl.'s 56.1 (ML) ¶¶ 90–93.)  Also in connection with her LTD application, Plaintiff submitted a "Reimbursement Agreement for Social Security," (ML 56.1 ¶¶ 42–43; Pl.'s 56.1 (ML) ¶¶ 42–43), and IBM provided a "Statement of Employer," dated January 3, 2007, which listed 0% as Plaintiff's occupation's requirements for sitting, standing and walking.  (ML 56.1 ¶¶ 44–45; Pl.'s 56.1 (ML) ¶¶ 44–45; SCH 913.)  Plaintiff disputes the accuracy of the "Statement of Employer" form.  (Pl.'s 56.1 (ML) ¶ 45.)  In 2008, IBM indicated that Plaintiff's job requirements were such that she "sits for about 90% of the day and

---

[8] According to Plaintiff, the March 5, 2007 and November 3, 2008 letters that she received from MetLife contained essentially the same definition of "disability," except that the second sentence stated:  "After expiration of that 12 month period, totally disabled means that, because of a sickness or injury, you cannot perform the important duties of your occupation or of any other gainful occupation for which you are reasonably fit by your education, training or experience."  (Pl.'s 56.1 (ML) ¶ 36.)  The only difference is that the sentence adds the phrase, "your own occupation or."

walks/stands less than 5% of an 8hr day" and that she "was not required to travel." (ML 56.1 ¶ 206; Pl.'s 56.1 (ML) ¶¶ 45, 206.)

In January 2007, Dr. Cruciani submitted an Attending Physician Statement ("APS"), which listed the following diagnoses for plaintiff's condition: progressive Facet's disease, degenerative disc disease, right rotator cuff, and possible cervical stenosis. (ML 56.1 ¶¶ 46–47; Pl.'s 56.1 (ML) ¶¶ 46–47; SCH 900, 902–04.) The APS listed Plaintiff's subjective complaints as "(i) acute pain; (ii) lack of stamina; (iii) inability to stand for substantial periods; and (iv) right-side uncoordinated, typing, drop things, etc." (ML 56.1 ¶ 48; Pl.'s 56.1 (ML) ¶ 48.) Dr. Cruciani indicated that Plaintiff was totally disabled for her own occupation, he could not determine if she was totally disabled for "any occupation," and he did not think she would be able to resume work activities. (SCH 903.)

According to MetLife, Plaintiff's application for LTD benefits was assigned to a MetLife Case Management Specialist, Linda Potter, who requested a clinical consultant review, which was performed by MetLife nurse consultant, Lisa Fletcher RN. (ML 56.1 ¶¶ 94–96.) By letter dated March 5, 2007, MetLife advised Plaintiff that her LTD benefits application had been approved effective March 14, 2007, and notified Plaintiff that after twelve months, the definition of "disability" changes from an "own occupation" to an "any occupation" test. (*Id.* ¶ 99; Pl.'s 56.1 (ML) ¶ 99; SCH 526–29.) The letter further advised Plaintiff that MetLife "w[ould] be requesting updated medical statements periodically to certify continued disability as defined in [the LTD] plan." (SCH 528.) The letter also explained that a 24-month limitation applied because Plaintiff's claimed disability fell within the LTD Plan's "soft tissue" limitation, and that these benefits would be exhausted on March 13, 2009. (*Id.*; ML 56.1 ¶ 100; Pl.'s 56.1 (ML) ¶ 100.)

By letter dated June 27, 2007, MetLife advised plaintiff that IBM had removed the soft-tissue limitation from the LTD Plan and that her benefits were no longer subject to the 24-month limitation, but instead would continue "for as long as [she] continue[d] to satisfy the definition of disability and all other requirements of the plan."  (SCH 540; ML 56.1 ¶101; Pl.'s 56.1 (ML) ¶101.)

By letter dated July 19, 2007, MetLife requested information regarding a review of Plaintiff's claim for continuing LTD benefits.  (SCH 542.)  Specially, MetLife requested that Plaintiff provide MetLife with "current office notes from all treating physicians from last 3 office visits, including current exam findings," "treatment plan (including medications)," "diagnostic test results/lab reports," and "completion of provided Attending Physicians Statement."  (*Id.*)  By letter dated July 20, 2007, MetLife requested additional information and indicated that the "information will be requested in connection with the 'any occupation' investigation currently being conducted on your claim."  (SCH 543.)

MetLife contends that, as part of this continuing review, Ms. Potter forwarded all medical information received to date to a MetLife nurse consultant, Darsel Excell RN, who reviewed the medical information and noted that there was no diagnostic testing to support the claimed restrictions and limitations.  (ML 56.1 ¶¶ 109–10.)  MetLife's claim log reflects that Nurse Excell attempted to contact Plaintiff on at least three occasions.  (SCH 101.)  Nurse Excell drafted a letter dated October 8, 2007 to Dr. Cruciani requesting additional information and enclosing a Work Restrictions and Limitations form.  (SCH 860–63; ML 56.1 ¶¶ 110–11; Pl.'s 56.1 (ML) ¶ 111.)  The instructions requested, among other things, that Dr. Cruciani "address [several issues] and provide work restrictions and limitations."  (SCH 860.)  The form was sent to Dr. Cruciani on November 8, 2007, and Dr. Cruciani returned it on November 14, 2007.

(SCH 097, 101; ML 56.1 ¶¶ 111–12; Pl.'s 56.1 (ML) ¶¶ 111–12.)  Dr. Cruciani listed Plaintiff's

"primary disabling diagnosis" as "cervical stenosis" and "other back symptoms," Plaintiff's

"secondary diagnosis" as Facet disease and lumbago, and Plaintiff's "co-morbid conditions" as

"depression/DJD."  (SCH 857.)  Under the heading "RESULTS OF ANY DIAGNOSTIC

TESTING (we do not have any diag testing on file for patient) (EMG, NCS, MRI, CT or X

RAYS) and dates performed," Dr. Cruciani left the response space blank.  (SCH 857.)  Below

the space provided to answer this question, but before the next question, Dr. Cruciani wrote "to

be determined @ appt. on 11/27/07."  (SCH 857.)  Dr. Cruciani checked "No" in response to

Question 2, which asked "Is the patient able to RTW [return to work] with or without

restrictions?"  (SCH 859.)  Dr. Cruciani left blank the space provided for answering Question 4,

which instructed:  "**If you DO NOT feel the patient is able to return to work, EVEN WITH**

**RESTRICTIONS then please provide current OBJECTIVE medical findings, treatment**

**plan, functional impairments**."  (SCH 859 (emphasis in original).)

     According to MetLife, on November 20, 2007, Nurse Excell referred all of the medical

records received to date for review by an independent physician consultant ("IPC").  (ML 56.1 ¶

114.)  Lawrence Rubens, M.D., board certified in orthopedic surgery, reviewed and summarized

the medical records received, as well as other documents that were part of the claim file.  (*Id.*

¶ 116; SCH 640–41.)  According to Dr. Rubens' report, the "only clinical documentation

available for [his] review consist[ed] of 4 clinic notes from . . . Dr. Cruciani."  (SCH 641.)  The

report also discusses two additional "disability" forms that Dr. Cruciani filled out, and states that

Plaintiff "had seen at least five other physicians but their medical records [we]re not available."

(SCH 642.)  According to Dr. Rubens, "MRI's ha[d] been done but no reports were available,"

although Dr. Cruciani's submissions, which were reviewed by Dr. Rubens, discussed the MRI

findings.  (SCH 642.)  Dr. Rubens spoke with Dr. Cruciani by telephone.  (SCH 641.)  Dr.

Rubens's report also lists a variety of other documentation (totaling 112 pages) that he reviewed.

(SCH 640–41.)

Dr. Rubens concluded that "[t]here [wa]s inadequate documentation of positive object

[*sic*] physical findings to support a functional limitation from [Plaintiff's] normal sedentary

duties on a physical basis," and that "[t]he impairments and medical are not severe enough to

cause functional limitations preventing the employee from performing her sedentary job."  (SCH

643.)  Dr. Rubens also found that "[t]he restrictions and limitations provided by Dr. Cruciani are

not consistent with the medical findings," and that "the restrictions and limitations appear to be a

response to [Plaintiff's] self reported complaints without the support of positive objective

physical findings of a significant nature to preclude the duties of her own occupation."  (*Id.*)

With regard to whether Plaintiff was receiving appropriate treatment, he stated that "[j]ust giving

opioids alone, without some type of cognitive intervention, is not an ideal treatment."  (*Id.*)

Because his training is as an orthopedic surgeon, Dr. Rubens declined to assess Plaintiff's

psychiatric limitations.  (*Id.*)

On December 3, 2007, Nurse Excell faxed Dr. Rubens's report to Dr. Cruciani for

comment, and Dr. Cruciani sent a response, dated December 5, 2007, wherein he stated his

objections to the report, but did not include any additional medical records.  (SCH 645–46; ML

56.1 ¶¶ 121–26; Pl.'s 56.1 (ML) ¶¶ 121–26.)  On December 17, 2007, Ms. Potter faxed Dr.

Cruciani's response to Dr. Rubens, (ML 56.1 ¶ 129; Pl.'s 56.1 (ML) ¶ 129), and on December

21, 2007, Dr. Rubens provided an addendum report, which found that no new objective evidence

of impairments was presented and that his opinion that plaintiff was physically able to perform

her sedentary job remained unchanged, (ML 56.1 ¶¶ 130–31; Pl.'s 56.1 (ML) ¶¶ 130–31; SCH

839).  Dr. Rubens did amend his statement from "just giving opioids" to "just treating with medications."  (SCH 839.)

On December 28, 2007, the addendum report was sent to Dr. Cruciani for comment, and he submitted a response dated January 2, 2008.  (SCH 647–48; ML 56.1 ¶¶ 132–33; Pl.'s 56.1 (ML) ¶¶ 132–33.)  Dr. Cruciani's response was forwarded to Dr. Rubens, who after review, continued to adhere to his prior determination in an addendum report dated January 14, 2008. (SCH 649; ML 56.1 ¶¶ 135–36; Pl.'s 56.1 (ML) ¶¶ 135–36.)

Plaintiff's claim also was referred to MetLife's Special Investigation Unit ("SIU"), which performed requested surveillance of Plaintiff's home.  (ML 56.1 ¶¶ 137–38; Pl.'s 56.1 (ML) ¶¶ 137–38.)  The surveillance results were unremarkable.  (SCH 598–601; ML 56.1 ¶ 139; Pl.'s 56.1 (ML) ¶ 139.)  The investigator also performed internet research, which indicated that Plaintiff was breeding and showing dogs as late as May 28, 2007.  (ML 56.1 ¶ 140; SCH 595.) Plaintiff disputes this finding, and states that she "had not shown a dog since 2003 or bred a dog since 2004."  (Pl.'s 56.1 (ML) ¶ 140; *but see* SCH 657 (Dr. O'Leary's July 20, 2005 exam notes: "She breeds dogs"); SCH 082 (January 2007 MetLife claim log entry:  "EE [employee, *i.e.*, Plaintiff] and husband also raised show dogs but now just has [sic] 2 dogs for breeding purposes"); SCH 500 (July 21, 2008 Appeal letter from Plaintiff's counsel attaching the surveillance report, noting that it was improper for Dr. Rubens to ignore the findings in the surveillance report, and that "the investigator's report supports Ms. Schlenger's disability claim."); SCH 665 (Dr. Hansraj's September 28, 2005 exam notes:  "For recreation the patient reports gardening, breeding dogs.").)

According to MetLife, on January 23, 2008, Potter reviewed all of the information in Plaintiff's file, and concluded that Plaintiff did not meet the definition of disability under the

terms of IBM's LTD Plan.  (ML 56.1 ¶ 141.)  Potter forwarded her recommendation to terminate Plaintiff's LTD benefits to MetLife Unit Manager, Christine Parent, who agreed with Potter's recommendation.  (ML 56.1 ¶¶ 141–43; Pl.'s 56.1 (ML) ¶¶ 141–43.)

On January 28, 2008, MetLife informed Plaintiff that she no longer qualified to receive payments under IBM's LTD Plan.  (SCH 813; ML 56.1 ¶¶ 145–46; Pl.'s 56.1 (ML) ¶¶ 145–46.) The January 24, 2008 denial letter stated that "no current exam findings or rationale was provided that would indicate a severity of an impairment that would prevent you from performing the essential duties of your own job as a Senior Contract Professional as well as any occupation according to your education, training and experience."  (SCH 814.)  The letter further explained that if Plaintiff appealed the decision, MetLife "suggest[ed] that [she] provide clinical documentation that includes:  physical exam findings, abnormal diagnostic testing results and current restrictions/limitations that documents an impairment in functional abilities that would prevent you from performing the essential duties of your own job."  (SCH 814.)

Meanwhile, the Social Security Administration ("SSA") had approved, on August 12, 2007, Plaintiff's claim for Social Security Disability Income ("SSDI") benefits in the amount of $1,812.00 per month from August 2007.  (ML 56.1 ¶ 102; Pl.'s 56.1 (ML) ¶ 102.)  The SSA also approved a retroactive lump sum award of $5,436.00 for May, June and July 2007.  (ML 56.1 ¶ 103; Pl.'s 56.1 (ML) ¶ 103.)  The Notice of Award did not include any rationale or explanation for the SSA's decision.  (ML 56.1 ¶ 104; Pl.'s 56.1 (ML) ¶ 104.)  MetLife sent Plaintiff a letter dated September 5, 2007, identifying $7,109.38 due to MetLife under the LTD Plan as a result of overpayments of LTD Plan benefits caused by the SSA's retroactive award of SSDI benefits. (ML 56.1 ¶ 105; Pl.'s 56.1 (ML) ¶ 105.)  The letter set forth MetLife's calculation of the amount

of overpayment owed by Plaintiff.  (SCH 177–78.)  Plaintiff submits that she objected to the calculation.  (Pl.'s 56.1 (ML) ¶ 107.  *But see id.* ¶ 220; ML 56.1 ¶ 220.)

In February 2008, Plaintiff contacted IBM about "employment" and requested that she be put back on STD.  (SCH 115; ML 56.1 ¶¶ 14849; Pl.'s 56.1 ¶¶ 148–49.)  IBM informed Plaintiff that that would not be possible, and advised Plaintiff of the documentation that she should provide for her appeal.  (SCH 115.)  Later that year, Plaintiff (through her husband and attorney) requested reconsideration of MetLife's decision, without going through the formal appeals process.  (*E.g.*, SCH 116–18; ML 56.1 ¶¶ 150–60; Pl.'s 56.1 (ML) ¶¶ 150–60.)  Plaintiff formally appealed MetLife's decision by letter dated July 21, 2008.  (SCH 491.)  The letter raised various issues, including, but not limited to the following:  (i) MetLife relied on an improper definition of Plaintiff's job requirements; (ii) Dr. Cruciani's opinion was not fully considered; (iii) MetLife ignored the SSA's determination that Plaintiff was disabled; (iv) Dr. Rubens' report was flawed because he was not qualified to consider Plaintiff's cognitive impairments, he reviewed non-medical information, and he never examined or saw Plaintiff; and (vii) the initial review failed to consider the results of the surveillance.  (SCH 491–502.)  Plaintiff's attorney also requested "copies of all documents (including the Plan document), records and other information relevant to Ms. Schlenger's claim . . . ."  (SCH 501.)

MetLife assigned the appeal to MetLife Appeals Specialist, Shelly D'Amico.  (ML 56.1 ¶ 167.)  As part of the appeal, D'Amico sent Plaintiff's records to two independent physicians, Peter Sugerman, M.D., board certified in adult psychiatry, and Dr. Arousiak Varpetian, M.D., board certified in internal medicine and neurology.  (ML's 56.1 ¶¶ 168–69; 173–74.)  Dr. Sugerman determined that the "file does not provide any current evidence of a significant psychiatric condition beyond 2/23/08 that would be . . . causing impairment," nor does the file

"detail why [] current psychiatric symptoms would prevent the employee from performing work tasks."  (SCH 273–74.)  Dr. Varpetian concluded that "[e]xtensive medical records show that [Plaintiff] has complained of pain without any corresponding objective findings," that the "neurological examination has been inconsistent throughout the time that she was followed by multiple clinicians," and that "[t]here [we]re no objective tests other than the imaging study," but the "results of the imaging studies do not consistently correlate with the complaints or the objective findings."  (SCH 279.)  Dr. Varpetian spoke to Dr. Cruciani.  In his report, Dr. Varpetian said that Dr. Cruciani "agreed that [Plaintiff's] symptoms were only subjective" and that "there was no atrophy or weakness over many years of radicular complaints."  (SCH 276.)

Dr. Sugerman's and Dr. Varpetian's reports were provided to Drs. Cruciani and Hansraj, as well as Plaintiff's attorney.  (SCH 191–93; ML 56.1 ¶¶ 183–84; Pl.'s 56.1 (ML) ¶¶ 183–84.) By letter dated August 20, 2008, Dr. Cruciani responded to the reports.  (SCH 212–15; ML 56.1 ¶ 188; Pl.'s (ML) ¶ 188.)  MetLife contends that it never heard from Dr. Hansraj.  (ML 56.1 ¶ 176.)  By letter dated August 22, 2008, Plaintiff's attorney voiced objections to the independent physician reports, (SCH 192–93), requested certain documents, and requested an accounting of the alleged overpayment.  (SCH 191–93.)  By letter dated September 8, 2008, Plaintiff's attorney complained that Plaintiff had not received all of the plan documents, nor an accounting for overpayments of LTD benefits.  (SCH 185; ML 56.1 ¶ 198; Pl.'s 56.1 (ML) ¶ 198.)  By letter dated September 11, 2008, D'Amico advised Plaintiff's attorney of the procedure for requesting LTD Plan documents and provided the attorney with another copy of MetLife's September 7, 2007 letter showing the overpayment.  (SCH 128, 175–76; ML 56.1 ¶ 199; Pl.'s 56.1 (ML) ¶ 199.)

After receiving Dr. Cruciani's August 20, 2008 letter, Dr. Varpetian noted by supplemental report dated September 22, 2008 that Dr. Cruciani's letter provided "no new information." (SCH 160–61.) On October 17, 2008, MetLife requested clarification from IBM of Plaintiff's job description, and IBM responded on November 3, 2008 by stating that Plaintiff "sits for about 90% of the day and walks/stands less than 5% of an 8hr day [and that she] was not required to travel." (SCH 132; ML 56.1 ¶¶ 203, 206; Pl.'s 56.1 (ML) ¶¶ 203, 206.) By letter dated November 3, 2008, MetLife advised Plaintiff's attorney that MetLife had determined to uphold its original decision following review on appeal. (SCH 147–51.) The letter also advised that Plaintiff had exhausted the Plan's administrative appeals and that she had the right to commence an action for benefits under ERISA Section 502(a). (SCH 151.) Further, the letter stated that:

> The IBM Employee Services Center (ESC) has been advised of the termination of your client's LTD benefits. It is IMPORTANT that she immediately contact the ESC . . . regarding her status, since her IBM medical benefits are affected by this change. . . . If she does not contact the ESC within 30 days from the date of this letter, IBM will consider her to have voluntarily resigned, and all benefits will cease.

(SCH 151 (emphasis in original).)

On December 16, 2008, Plaintiff's employment with IBM ended, although Plaintiff does not say how. (Am. Compl. ¶¶ 63, 67–68, 147; Fid. 56.1 ¶ 30; Pl.'s 56.1 (Fid) ¶ 30.) Plaintiff continued receiving health insurance coverage under the IBM Plans until December 31, 2008. According to Plaintiff, MetLife's denial of her LTD benefits claim "had the effect of terminating all other benefits, including [her] health insurance and life insurance." (Am. Compl. ¶ 82.)

Plaintiff received two notifications, one dated December 19, 2008 and another dated January 9, 2009, on IBM letterhead notifying Plaintiff of her right to elect continuation of group health coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985

("COBRA") for up to eighteen (18) months.  (Fid. 56.1 ¶ 32; Pl.'s 56.1 (Fid) ¶ 32; Dickstein

Decl. Exs. 13, 14.)  The notifications make clear that in addition to Plaintiff, her husband and son

also were eligible for COBRA continuation coverage.  (*E.g.*, Dickstein Decl. Ex. 13 at Fidelity

507.)  The letters further stated that if Plaintiff elects coverage under COBRA, the premiums

would be "102% of the applicable premium of the plans(s) for the current plan year."  Plaintiff

contacted Fidelity and claimed that she was entitled to a subsidy for the continued health

insurance coverage under COBRA.  (Fid. 56.1 ¶ 33; Pl.'s 56.1 (Fid) ¶ 33.)  Fidelity referred

Plaintiff to the Summary Plan Description ("SPD") for IBM's health care plan, which explains

that the cost of COBRA coverage is 102% of the applicable premiums for the plan for the current

year, and does not provide for any subsidy.  (*Id.*)  Fidelity referred Plaintiff to the IBM Plan

Administrator.  (*Id.*)  During a call with the ECS, Plaintiff stated, among other things, that "I

think Fidelity should be covering their bases by going to their own attorneys and saying, look,

this is what was sent to this woman, and this is the only way we can administer it.  But that's up

to Fidelity, I don't care, you know, if I . . . have to go through the trouble of putting together a

discrimination lawsuit, I'm just going to put everybody's name in, and I don't really care who

gets dinged.  I really don't.  I'm so disgusted."  (Fid. 56.1 ¶ 42; Pl.'s 56.1 (Fid) ¶ 42.)

　　　On April 22, 2009, Plaintiff filed her complaint against MetLife and Fidelity.  (Doc. 1.)

Plaintiff added Defendant IBM in the Amended Complaint, filed on November 13, 2009.  (Doc.

12.)  IBM served its Motion to Dismiss pursuant to Rules 12(b)(6) and 9(b) on February 22,

2010, (Doc. 32); Plaintiff opposed on March 15, 2010, (Doc. 36); and IBM replied on March 29,

2010, (Doc. 35).  MetLife served its Motion for Summary Judgment on July 2, 2010, (Doc. 42);

Plaintiff opposed and cross-moved for summary judgment, and moved for attorneys fees, on

August 13, 2010, (Docs. 55, 58); and MetLife replied and opposed plaintiff's cross-motion on

August 27, 2010, (Doc. 63).  Fidelity served its Motion for Summary Judgment and attorneys

fees on July 2, 2010, (Doc. 47); Plaintiff opposed on August 13, 2010, (Doc. 52); and MetLife

replied on August 27, 2010, (Doc. 59).

II.     **METLIFE'S AND FIDELITY'S MOTIONS FOR SUMMARY JUDGMENT**

A.     <u>**Summary Judgment Standard**</u>

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant

bears the initial burden of demonstrating the absence of a genuine issue of material fact, and, if

satisfied, the burden then shifts to the non-movant to present evidence sufficient to satisfy every

element of the claim.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  "The mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the

non-movant "must do more than simply show that there is some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v.*

*Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  In the event a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

B.     **Analysis**

Count One and MetLife's Counterclaim—Social Security

Defendant MetLife moves for summary judgment dismissing Count One of Plaintiff's Amended Complaint, which alleges that MetLife wrongfully confiscated Plaintiff's social security benefits, and MetLife further seeks summary judgment on its counterclaim to recover an alleged $4,726.05 overpayment of LTD benefits pursuant to IBM's LTD Plan and the Reimbursement Agreement signed by Plaintiff and submitted as part of her application for LTD benefits.  Plaintiff cross-moves for summary judgment on Count One of her Amended Complaint.

According to MetLife, it is entitled to offset the LTD benefit payments it made to Plaintiff by the amount of social security benefit payments that Plaintiff received from the Social Security Administration ("SSA") based on a specific provision in IBM's LTD Plan and the Reimbursement Agreement that Plaintiff signed and submitted together with her application for benefits.  Plaintiff argues that MetLife is not entitled to offset her LTD benefits by the amount of her social security benefits, and that the $4,726.05 that MetLife seeks is not recoverable because the Reimbursement Agreement "is a contract of adhesion," and "contravene[s] the anti-alienation provisions under ERISA and the Social Security Act providing that . . . benefits received under

the statutes are not subject to assignment or other forms of alienation." (Pl.'s Opp'n (ML)[9] 23

(citing 42 U.S.C. § 407(a) and 29 U.S.C. § 1056(d)(1)).) Plaintiff claims that MetLife's

counterclaim also "must fail for its failure to identify the particular funds from which its

overpayments must be restored," because "[i]n equitable actions for restitution of insurer

overpayments, . . . 'the restitution must involve the imposition of a constructive trust or equitable

lien on particular funds or property in the [insured's] possession.'" (*Id.* at 23–24.) According to

Plaintiff, "[b]ecause MetLife's alleged overpayment cannot clearly be traced or segregated . . . its

counterclaim should be dismissed." (*Id.* at 24.) I disagree.

Section 502(a)(3) of ERISA permits a plan fiduciary to obtain "appropriate equitable

relief," and an action for overpayment of plan benefits is such "equitable relief." *Sereboff v. Mid*

*Atl. Med. Servs., Inc.*, 547 U.S. 356, 361 (2006) (plan fiduciary seeking alleged overpayment of

plan benefits was seeking "equitable relief" available under Section 502(a)(3) of ERISA

authorizing "appropriate equitable relief"); *Mugan v. Hartford Life Grp. Ins. Co.*, No. 09-6711,

2011 WL 291851, at *12 (S.D.N.Y. Jan. 20, 2011) ("[F]iduciaries of ERISA plans may bring suit

under section 502(a)(3) to recover payments to beneficiaries that are later offset by a retroactive

award of Social Security benefits."). The plan fiduciary must, however, "seek not to impose

personal liability on the [claimant], but to restore to the [Plan] particular funds or property in the

[claimant's] possession." *Id.* (alterations in original).

Courts in the Second Circuit routinely have enforced SSDI offset provisions in ERISA

Plans as written, as well as Reimbursement Agreements similar to that at issue here, and have not

found them to be contracts of adhesion. *See, e.g.*, *Mugan*, 2011 WL 291851, at *12–13; *Fortune*

*v. Grp. Long Term Disability Plan for Emps. of Keyspan Corp.*, 637 F. Supp. 2d 132, 145–46

---

[9] "Pl.'s Opp'n (ML)" refers to Plaintiff's Memorandum of Law in Opposition to MetLife's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment. (Doc. 55.)

(E.D.N.Y. 2009), *aff'd*, 391 F. App'x 74 (2d Cir. 2010); *see also Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989) (any benefits available to plaintiff under applicable LTD plan would be offset by worker's compensation and social security benefits plaintiff was already receiving).

The plain and unambiguous import of the IBM LTD Plan provision is that MetLife is permitted to offset Plaintiff's long-term disability benefits by the amount in SSDI benefits that she received. The IBM LTD Plan states that:

> The benefits payable under the LTD Plan will be reduced by . . . the actual or estimated . . . Social Security Disability Income benefits . . . which you, your spouse or your child(ren) . . . are entitled to by reason of your disability . . . ."
>
> ***
>
> [The] monthly benefit will not be reduced by estimated Social Security disability benefits if . . . (1) [plaintiff] provide[s] proof that [she] ha[s] applied for Social Security Disability benefits; (2) [plaintiff] sign[s] the reimbursement agreement which confirms that [she would] repay all overpayments that are due to the IM LTD Plan [and] (3) [plaintiff] sign[s] the form authorizing the Social Security Administration to release information on awards directly to [MetLife].

(Hallford Decl. Ex. A at 017–18.)

Here, as in *Mugan*, there is no dispute that MetLife is a fiduciary under the LTD Plan or that, as provided for in the LTD Plan, the Reimbursement Agreement, dated December 21, 2006, permits MetLife to recoup overpayment of LTD benefits due to a failure to offset. The Reimbursement Agreement states that Plaintiff "will repay all overpayments that are due to IBM Long Term Disability Plan." (SCH 941.)[10]

---

[10] It does not appear, contrary to Plaintiff's assertion, that signing the Reimbursement Form was a "precondition of receiving her LTD benefits." (Pl.'s Opp'n (ML) 23; Pl.'s 56.1 (ML) ¶¶ 42–43.) In support of this proposition, Plaintiff cites to IBM's LTD Plan and to a March 5, 2007 letter from MetLife to Plaintiff. (SCH 527 (March 5, 2007, MetLife Letter); Hallford Decl. Ex. A at SCH 018 (IBM LTD Plan).) Both documents, however, make clear that Plaintiff was not "required" to submit the Reimbursement Agreement, but instead state that in the event she decided not to do so, MetLife could have reduced the LTD benefits payable to Plaintiff based on an estimated SSDI benefit amount. (SCH 527; Hallford Ex. A at 018.)

Because MetLife's counterclaim asserts an interest in MetLife's overpayment of benefits, as opposed to an interest in Plaintiff's social security disability benefits, I reject Plaintiff's argument that MetLife's counterclaim must be dismissed because the social security benefits that Plaintiff received are not subject to assignment or other forms of alienation.  *See Mugan*, 2011 WL 291851, at *13.  I also find unavailing Plaintiff's argument that MetLife's counterclaim "must fail for its failure to identify the particular funds from which its overpayments must be restored."  (Pl.'s Opp'n (ML) 23); *see Solomon v. Metro. Life Ins. Co.*, 628 F. Supp. 2d 519, 534 (S.D.N.Y. 2009) ("[T]he Plan fiduciary is entitled to relief in the form of a constructive trust on the overpayment *amount* specifically identified in the Plan, as distinct from [the insured's] general assets."); *Sereboff*, 547 U.S. at 364–65 (no strict tracing requirement for equitable liens by agreement).

For the reasons stated above, MetLife's Motion for Summary Judgment dismissing Count One of Plaintiff's Amended Complaint is GRANTED, its Motion for Summary Judgment on its counterclaim for equitable restitution is GRANTED, and Plaintiff's Cross-Motion for Summary Judgment on Count One is DENIED.  It does not appear that Plaintiff disputes the amount of the overpayment, (*e.g.*, Pl.'s 56.1 (ML) ¶ 220), but she should advise the Court if she disputes the $4,726.05 calculation.

Count Two—Fidelity's and MetLife's Alleged Failure to Furnish LTD Plan Documents Upon Demand

Defendants Fidelity and MetLife argue that this Court should grant summary judgment in their favor dismissing Count Two of Plaintiff's Amended Complaint, which alleges that Fidelity and MetLife failed to furnish to Plaintiff upon demand all LTD Plan documents.  (Am. Compl. ¶¶ 112–17.)  Plaintiff's Amended Complaint indicates that she seeks "[p]ayment of the full statutory amount due for failure to timely furnish Plan documents."  (*Id*. at 29 (Prayer for Relief ¶ E).)

Section 502(c)(1) of ERISA permits the imposition of statutory penalties against an "administrator" in the event that it "fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary."  29 U.S.C. § 1132(c)(1).  Section 3(16)(A) of ERISA defines an "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated . . . ."  29 U.S.C. § 1002(16)(A)(i).  If there is no person designated as the plan administrator in the plan documents, the plan's sponsor is deemed to be the administrator.  29 U.S.C. § 1002(16)(A)(ii).

Here, the LTD Plan identifies "Manager of U.S. Benefits Services, IBM Human Resources" as the "Plan Administrator," not Fidelity or MetLife.  (Hallford Decl., Ex. A at SCH SCH 077;[11] *see id.* Ex. A at SCH 023.)  Since neither Fidelity nor MetLife is "the person specifically so designated by the terms of the instrument under which the plan is operated," 29 U.S.C. § 1002(16)(A)(i), neither is the plan "administrator" within the meaning of Section 502(c)(1) of ERISA, and Plaintiff therefore is precluded from recovering "statutory damages"

---

[11] Specifically, IBM's LTD Plan explains that it is "established by IBM Corporation, New Orchard Road, Armonk, NY," that it is "governed by ERISA," that "[t]he Plan Administrator is the Manager of U.S. Benefits Services, IBM Human Resources," and that "[t]he address for the Plan Administrator is:  Office of the Plan Administrator, IBM Employee Services Center, 5411 Page Road, Durham, NC 27703."  (Hallford Decl. Ex. A at SCH 077.)

under Section 502(c)(1) for their alleged non-disclosure of documents. *See Krauss v. Oxford Health Plans, Inc.*, 418 F. Supp. 2d 416, 434 (S.D.N.Y. 2005), *aff'd*, 517 F.3d 614, 631 (2d Cir. 2008).[12]

Plaintiff raises for the first time in her Memoranda of Law in Opposition to Defendants' Motions for Summary Judgment that the relief she seeks in Count Two is "equitable" in nature and pursuant to Section 502(a)(3) of ERISA.[13] (Pl.'s Opp'n (ML) 21; Pl.'s Opp'n (Fid) 2, 13–15.) Under Section 502(a)(3) of ERISA, a "participant, beneficiary or fiduciary" may bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). According to the Supreme Court, "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Varity Corp. v. Howe*, 516 U.S. 489, 515 (2006). "Equitable relief" under Section 502(a)(3) refers to "those categories of relief that were typically available in equity," but "something less than all relief." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (internal quotation marks omitted). Section 502(a)(3) is a "catchall" that "offer[s] appropriate equitable relief for injuries caused by violations that [ERISA] does not elsewhere adequately remedy." *Varity*, 516 U.S. at 512.

---

[12] Although the statement, "[t]he LTD Plan is administered by Metropolitan Life Insurance Company" also appears in the LTD Plan, (Hallford Decl. Ex. A at SCH 023), the same document's later designation of an IBM Manager as the "Plan Administrator," (*id.* Ex. A at SCH 077), makes clear that the earlier statement is not a specific designation of the Plan Administrator but rather simply a plain-English description of MetLife's role. Further, the plan distinguishes MetLife from the Plan Administrator. (*See, e.g.*, *id.* Ex. A at SCH 023–24 (distinguishing between MetLife and the Plan Administrator).)

[13] According to Plaintiff, "[t]he general rule that only the Plan Administrator may be held liable for inadequate disclosures has no application in this matter" because the relief she seeks is available under Section 502(a)(3) of ERISA, which "allows a Plaintiff to 'pursue an equitable claim against a *de facto* administrator that failed to provide adequate disclosures.'" (Pl.'s Opp'n (ML) 21; Pl.'s Opp'n (Fid) 2, 13–15 (Doc. 52).) I need not address whether Fidelity or MetLife is a "*de facto*" plan administrator for purposes of ruling on Count Two, however, because (as discussed below) I find that Plaintiff does not seek "appropriate equitable relief" under Section 502(a)(3), and in any event, Defendants apparently provided to Plaintiff the requested LTD Plan documents.

"Since *Varity*, courts have found [Section 502(a)(3)] applicable when ERISA does not elsewhere provide a remedy for a wrong suffered by plaintiff, or when plaintiff seeks additional equitable relief that differs from monetary relief sought according to the specific remedies provided in ERISA's other sections." *Klecher v. Metro. Life Ins. Co.*, 331 F. Supp. 2d 279, 286 (S.D.N.Y. 2004) (collecting cases).

Plaintiff's claim under Section 502(a)(3) for Defendants' alleged failure to provide plan documents fails.  First, Plaintiff does not seek "equitable relief."  As noted above, Plaintiff's Amended Complaint seeks "[p]ayment of the full statutory amount due for failure to timely furnish [LTD] Plan documents."  (Am. Compl. at 29.)  Money damages, however, "are, of course, the classic form of *legal* relief."  *Great-West Life*, 534 U.S. at 210 (internal citations omitted).  Plaintiff in her Memoranda of Law in Opposition to Defendants' Motions for Summary Judgment appears to have abandoned her claim for money damages, but does not identify the nature of the "equitable" relief that she seeks pursuant to Section 502(a)(3) of ERISA in that event.  (Pl.'s Opp'n (Fid) 15; Pl.'s Opp'n (ML) 21-22.)

Second, the relief Plaintiff seeks is not "appropriate."  Congress provided plan participants with a remedy in Section 502(c) for a plan administrator's failure to provide plan documents; thus, to the extent Plaintiff seeks relief under Section 502(a)(3) to remedy the same injury, the relief is not "appropriate."  *Varity*, 516 U.S. at 515 ("[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate' [under Section 502(a)(3)].").  Indeed, Plaintiff provides no reason why the relief available under Section 502(c) is not adequate, where the specific relief requested in Plaintiff's Amended Complaint is the very relief available under Section 502(c).

Further, to the extent Plaintiff seeks the equitable relief of an order directing production of missing documents, Plaintiff has not identified the LTD Plan documents she does not have, and it appears that Defendants have produced them.  "Fidelity sent a copy of the LTD Plan in effect for employees hired as of December 31, 2003," and while Plaintiff was hired before that date, "Fidelity later sent summary plan descriptions ("SPDs") of the LTD Plan for 2002-2005."[14] (Pl's 56.1 Ctr-Stmt. to ML ¶ 264; Fid. 56.1 ¶¶ 36–38; Pl's 56.1 Ctr-Stmt. to Fid. ¶¶ 37–38.)  "In November 2009, MetLife produced to Plaintiff a copy of the SPD governing IBM's LTD Plan for year 2006."  (Fid. 56.1 ¶ 39; Pl's 56.1 Ctr-Stmt to Fid. ¶ 39.)  Further, "MetLife sent a copy of the administrative record relating to the Plan documents to [Plaintiff] in or around early November 2009."[15]  (Pl.'s 56.1 (ML) ¶ 265; Hallford Decl. Ex. B (Administrative Record).)  In addition, the administrative record itself reflects that on August 7, 2008, MetLife sent to Plaintiff's counsel a letter that enclosed "[a] complete copy of Ms. Schlenger's claim file" as of that date.  (SCH 195.)  Thus, it appears that Plaintiff has received the requested documents relating to the LTD Plan.

For the foregoing reasons, Defendant Fidelity's Motion for Summary Judgment dismissing Count Two of the Amended Complaint is GRANTED, and Defendant MetLife's Motion for Summary Judgment dismissing Count Two of the Amended Complaint is

---

[14] This Circuit recognizes that SPDs contain the important information regarding an employee benefit plan, and often are considered the plan documents.  *See, e.g.*, *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 61 (2d Cir. 2006) ("[W]e look to the SPD and any alleged amendments to the SPD . . . as the relevant Plan documents."); *Tocker v. Philip Morris Co.*, 470 F.3d 481, 487–88 (2d Cir. 2006) ("[W]here the plan documents and the summary plan description conflict, the SPD controls.").  In addition, IBM and Fidelity stipulated on August 27, 2010, that each of IBM's Plans, including the LTD plan, "is governed by a summary plan description ('SPD')" and that "[t]he SPDs are the plan documents for the IBM Plans."  (Aug. 27, 2010 IBM/Fid. Stip. (Doc. 62.).)

[15] Although Plaintiff's Amended Complaint only alleges failure to produce LTD Plan documents, Plaintiff's 56.1 Statements and her Memoranda of Law in Opposition to Defendants' Motions for Summary Judgment further allege that Fidelity and MetLife have failed to produce "all of their internal and external communications relating to [Plaintiff's] claim for benefits (particularly any communications with IBM)."  (Pl.'s Opp'n (ML) 22; Pl.'s Opp'n (Fid) 14–15; Pl's 56.1 (ML) ¶ 266; Pl's 56.1 (Fid) ¶ 37.)  She has not explained what provision of ERISA required such production.

GRANTED.  Plaintiff's Motion for Summary Judgment against MetLife as to Count Two of the Amended Complaint is DENIED.

Count Three—Denial of Benefits by MetLife

Defendant MetLife moves for summary judgment dismissing Count Three of Plaintiff's Amended Complaint, which alleges that MetLife wrongfully terminated Plaintiff's benefits under the LTD Plan.  Section 502(a) of ERISA permits the beneficiary of an employee benefit plan to bring a civil action "to recover benefits due to [her] under the terms of [her] plan, [and] to enforce [her] rights under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  According to the Supreme Court, "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008), in which case the court "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious,'" *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995)).

The IBM LTD Plan states that MetLife "shall have discretionary authority to interpret the terms of the LTD Plan and to determine eligibility for and entitlement to LTD Plan benefits in accordance with the terms of the LTD Plan."  (SCH 024.)  I find, and the parties agree, that MetLife's decision denying Plaintiff's LTD claim should be reviewed under the "arbitrary and capricious standard."  (ML Mem. 14–16;[16] Pl.'s Opp'n (ML) 4.)

Under that standard, the question is whether the administrator's decision to deny benefits was "without reason, unsupported by substantial evidence or erroneous as a matter of law."

---

[16] "ML Mem." refers to MetLife's Memorandum of Law in Support of its Motion for Summary Judgment, filed July 2, 2010.  (Doc. 43.)

*Messina v. Blue Cross & Blue Shield Ass'n*, No. 03-0338, 2005 WL 2346085, at *4 (N.D.N.Y.

Sept. 23, 2005) (quoting *Pagan*, 52 F.3d at 441).  "Substantial evidence" means "such evidence

that a reasonable mind might accept as adequate to support the conclusion reached by the

administrator and requires more than a scintilla but less than a preponderance."  *Fortune*, 637 F.

Supp. 2d at 141 (internal quotation marks omitted).  Thus, the "scope of review is narrow," and

the Court is "not free to substitute [its] own judgment for that of [the insurer] as if [the Court]

were considering the issue of eligibility anew."  *Hobson*, 574 F.3d at 83–84 (internal citation

omitted) (second alteration in original).

    "'[A] plan under which an administrator both evaluates and pays benefits claims creates

the kind of conflict of interest that courts must take into account and weigh as a factor in

determining whether there was an abuse of discretion, but does not make *de novo* review

appropriate.'"  *Id.* at 82–83 (quoting *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133

(2d Cir. 2008)).  Rather, a showing that the administrator's conflict of interest affected the choice

of a reasonable interpretation is one of "several different considerations" that judges must take

into account when "review[ing] the lawfulness of benefit denials."  *Id*. at 83 (citations omitted)

(alteration in original).  "No weight is given to a conflict in the absence of any evidence that the

conflict actually affected the administrator's decision."  *Durakovic v. Bldg. Serv. 32 BJ Pension

Fund,* 609 F.3d 133, 140 (2d Cir. 2010).  The Court finds that MetLife operated under a

structural conflict of interest as MetLife both determined the validity of an employee's claims

under IBM's LTD Plan and was responsible for paying benefits to claimants.  Weighing this

conflict as a factor, I conclude that MetLife's determination was neither arbitrary nor capricious.[17]

Plaintiff argues that MetLife's denial of her LTD benefits was arbitrary and capricious because it is not supported by substantial evidence.  Further, Plaintiff argues that MetLife's "decision is based on multiple pieces of faulty evidence" and thus, "the decision cannot be said to have been 'reasoned to survive arbitrary and capricious review.'"  (Pl.'s Opp'n (ML) 14) (citations omitted).  I find that MetLife's determination was not arbitrary or capricious, and address each of Plaintiff's arguments to the contrary below.

First, Plaintiff argues that IBM's LTD Plan required MetLife to apply an "own occupation" definition of disability to Plaintiff's claim, but that MetLife instead applied an "any occupation" standard.  (Pl.'s Opp'n (ML) 9–15.)  I disagree.  The administrative record makes clear that MetLife applied an "own occupation" definition of disability requiring Plaintiff to establish an inability to perform the essential duties of her own regular occupation as an IBM Senior Contracts Professional.  For instance, MetLife's January 24, 2008 denial letter explains that MetLife had Plaintiff's file reviewed by an Independent Physician Consultant ("IPC") "to provide clarification of [Plaintiff's] ability to perform the essential duties of [her] own job," and that "[t]he clinical information that was reviewed does not support [Plaintiff's] inability to perform the essential duties of [her] sedentary job as a senior contract professional."  (SCH 813–14.)  The letter further states that "no current exam findings or rationale was provided that would indicate a severity of an impairment that would prevent [Plaintiff] from performing the essential duties of [her] own job as a Senior Contract Professional as well as any occupation according to

---

[17] In reviewing whether MetLife's decision was arbitrary and capricious, I am limited to evidence in the administrative record, unless good cause for considering additional evidence is shown.  *Alfano v. CIGNA Life Ins. Co. of N.Y.*, No. 07-9661, 2009 WL 222351, at *13 (S.D.N.Y. Jan. 30, 2009).

[her] education, training and experience."  (SCH 814.)[18]  MetLife's November 3, 2008 appeal denial letter specifically states that MetLife found "that there is no objective clinical evidence to support restrictions and limitations that preclude your client from performing her own occupation . . . ."  (SCH 151.)  Thus, I find that MetLife applied the proper definition of disability.

Second, Plaintiff argues that her occupation was more physically taxing than described by IBM, which originally listed 0% as Plaintiff's occupation's requirements for sitting, standing and walking, (SCH 913), and later indicated that Plaintiff's job requirements were such that she "sits for about 90% of the day and walks/stands less than 5% of an 8hr day," that she "was not required to travel," and that the job was sedentary.  (SCH 151; ML 56.1 ¶ 206; Pl.'s 56.1 (ML) ¶ 206.)  According to Plaintiff, her job as a Senior Contract Professional required her to "negotiate and draft contracts" in a "high volume, quick paced" environment and that she was expected to "interface heavily both with internal customers and external third party customers," requiring "her to be available at all hours, even on weekends."  (Pl.'s Opp'n (ML) 5–6.)  According to Plaintiff, the job required her to perform eight or more hours of continual typing of contractual documents, correspondence, and emails.  (SCH 492.)  Based on these duties, Plaintiff claims that her job was not "sedentary," but that MetLife assessed her ability to perform a sedentary job.  The evidence in the administrative record establishes that Plaintiff's job was sedentary:  it could be done from a desk with a telephone and computer and did not require physical exertion of any sort.  Thus, I do not find that MetLife acted arbitrarily and capriciously by regarding Plaintiff's job as sedentary.

Third, Plaintiff argues that MetLife improperly required her to provide "objective evidence" of her pain, failed to consider her subjective complaints, and, when it informed

---

[18] As earlier noted, the "own occupation" standard governed from March 2007 to March 2008, and the "any occupation" standard would have governed from March 2008 onwards.  (SCH 526–29.)

Plaintiff of its decision, failed to identify the type of evidence that would be sufficient to support Plaintiff's claimed disability.  The administrative record makes clear, however, that MetLife did consider Plaintiff's subjective complaints, (*e.g.*, SCH 147–51), but found that Plaintiff's subjective complaints of low back pain, chronic cervical pain and right shoulder pain were not consistent with the objective evidence.  Even Plaintiff's treating physician, Dr. Cruciani, who supported her disability claim, acknowledged the subjective nature of her Complaints.  (*See* SCH 276 ("When questioned about findings, [Dr. Cruciani] stated that there was no atrophy or weakness over the many years of radicular [*i.e.*, radiating pain] complaints.  He stated that Ms. Schlenger was impaired for the last two years.  He agreed that the symptoms were only subjective.").)  An insurer is entitled to request objective documentation of Plaintiff's disability, so long as it informs Plaintiff of the requirement to submit such evidence.  *See Hobson*, 574 F.3d at 88 ("[I]t is not unreasonable for ERISA plan administrators to accord weight to objective evidence that a claimant's medical ailments are debilitating in order to guard against fraudulent or unsupported claims of disability."); *Magee v. Metro. Life Ins. Co.*, 632 F. Supp. 2d 308, 318 (S.D.N.Y. 2009) ("While requiring plan participants to submit evidence of objective measures of functional limitations may be reasonable, participants must be informed of those requirements."); *see also Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) ("Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers such as [MetLife] must consider the possibility that applicants are exaggerating in an effort to win benefits . . . ."); *Schnur v. CTC Commc'ns Corp. Grp. Disability Plan*, No. 05-3297, 2010 WL 1253481, at *14 (S.D.N.Y. Mar. 29, 2010) ("[A] distinction exists between the amount of fatigue or pain an individual experiences, which is completely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured.")

(internal quotation marks omitted).  Further, the administrative record establishes that MetLife informed Plaintiff of the objective evidence necessary to support her claim.  MetLife's January 24, 2008 denial letter explicitly states that "[i]f it is your intent to appeal this decision, we suggest that you provide clinical documentation that includes:  physical exam findings, abnormal diagnostic testing results and current restrictions/limitations that documents an impairment in functional abilities that would prevent you from performing the essential duties of your own job."  (SCH 814.)  I find that this is specific enough to provide notice to Plaintiff of the type of evidence Plaintiff should submit.  Requiring Plaintiff to provide objective medical evidence does not deprive Plaintiff of a full and fair review.

Fourth, Plaintiff argues that MetLife's IPCs were not provided with, and/or failed to review, all of the medical evidence in Plaintiff's file, and that the IPCs relied on irrelevant or inaccurate information in reaching their conclusions.  In total, three IPCs reviewed Plaintiff's file:  Dr. Rubens, Dr. Sugerman, and Dr. Varpetian.

As to Dr. Rubens, Plaintiff claims that the majority of the 112 pages reviewed by Dr. Rubens consisted of "irrelevant, non-medical information such as correspondence with MetLife and Social Security, fax transmittal letters, tax withholding information for sick pay, the MetLife reimbursement agreement, a direct deposit form for disability payments and Ms. Schlenger's personnel file."  (Pl.'s Opp'n (ML) 10.)  According to Plaintiff, these papers "should have been segregated from her medical records."  I have not found any authority indicating that an IPC like Dr. Rubens is prohibited from reviewing or considering non-medical information.  *See Black v. Long Term Disability Ins.*, 582 F.3d 738, 747 (7th Cir. 2009) (consideration of non-medical information permitted).  Plaintiff further argues that Dr. Rubens failed to address Dr. Cruciani's findings regarding Plaintiff's ability to engage in only limited stress situations and limited

interpersonal relations, as well as Plaintiff's limitations regarding sitting, standing, and engaging

in fine-finger movements.  (Pl.'s Opp'n (ML) 10.)  While Dr. Rubens's report recites certain of

Dr. Cruciani's findings, such as his conclusion that she could not sit stand, or walk for 15

minutes, nor perform fine finger movements, Plaintiff is correct that Dr. Rubens does not

mention Dr. Cruciani's finding that Plaintiff could engage in only limited stress situations and

limited interpersonal relations.  (SCH 560–64.)  The absence of that statement from the report

does not mean that Dr. Rubens did not review or consider Dr. Cruciani's finding.  Dr. Rubens

did not assess Plaintiff's psychiatric limitations, and Plaintiff's ability to deal with stress and

interpersonal relations were outside the scope of his expertise.  As to Dr. Cruciani's view of

Plaintiff's physical limitations, Dr. Rubens concluded that the medical information did not

support Plaintiff's functional limitations, in terms of her usual and customary sedentary duties.

The medical information supported a finding that Plaintiff would be precluded from lifting 20

pounds, and that she had decreased and painful motion of the right shoulder, weakness of the

right arm, and diminished reflexes in the right arm.  The fact that Dr. Rubens did not agree with

Dr. Cruciani as to the implications of Plaintiff's ailments does not mean that MetLife acted

improperly in relying on his report.

Plaintiff also argues that Dr. Rubens's suggestion that cognitive behavioral therapy

("CBT") might be an appropriate treatment for Plaintiff, and his subsequent modification[19] of

that position upon contrary advice from Dr. Cruciani, demonstrates the faultiness of Dr.

Rubens's review.  (Pl.'s Opp'n (ML) 10.)  But Dr. Rubens's conclusion that that the medical

---

[19] Contrary to Plaintiff's contention that Dr. Rubens "retreat[ed]" from his position on CBT after Dr. Cruciani's
objection, (Pl.'s Opp'n (ML) 10), Dr. Rubens stated in his first response to Dr. Cruciani's objections that CBT has
been shown to be an effective therapy for pain, and only changed his reference to "opioids" to "medications," (SCH
839).  In his final report, Dr. Rubens stated that Dr. Cruciani's "assertions ha[d] gone beyond [his] area of expertise
as an orthopedic surgeon," and that Dr. Rubens "ha[d] stated [his] opinion, and provided references, and s[aw] no
reason to change them based on Dr. Cruciani's assertions."  (SCH 649.)

records failed to demonstrate that Plaintiff was unable to perform the important duties of her job is not impacted by the appropriateness (or not) of his suggesting CBT as a treatment.

As part of Plaintiff's appeal of MetLife's determination, MetLife had Plaintiff's file reviewed by two additional IPCs, Drs. Sugerman and Varpetian.  Plaintiff argues that MetLife's engagement of Dr. Sugerman, a board-certified adult psychiatrist, was unnecessary since facet disease and degenerative disc disorder were the bases of Plaintiff's claimed disability.  (Pl.'s Opp'n (ML) 12.)  I disagree that this was improper.  Dr. Cruciani found Plaintiff to be depressed during several office visits (SCH 522 ("Mood:  Depressed"), 523 (same), 524 (same), 673 ("intensity of [Plaintiff's] pain had driven [her] into suicidal ideations"); 674 ("Mood:  Mildly depressed," and noting "patient was suicidal," but as of January 2006, was "seeing a therapist"); *see* SCH 160, 561–62); Dr. Cruciani identified depression as a co-morbid condition, (SCH 562, 857; *see also* SCH 647–48 (Dr. Cruciani's objections to Dr. Rubens' report addressed depression and indicated that Dr. Cruciani stood by his "disability statements" regarding Plaintiff)), Dr. Rubens had not opined on those issues in his report since it was outside his area of expertise, (SCH 563, 584–85, 590), and Dr. Rubens indicated that referral to a psychiatrist IPC would be appropriate, (SCH 125 (MetLife log entry noting that Dr. Rubens advised "that a referral to psych IPC would be appropriate"), 649 (Dr. Rubens "defer[red] any psychiatric issues to an appropriate specialty").)  Further, Dr. Kanner's June 29, 2006 exam notes indicate that "patient admits to some depression and anxiety," (SCH 718), that her "picture is complicated by her social situation, anxiety/depression, obesity, and deconditioning," (SCH 721), and that "it would probably be reasonable to add an antidepressant medication," (*id.*).  Further, Dr. Cruciani told Dr. Varpetian that "[Plaintiff] suffers from depression."  (SCH 276.)  Finally, Plaintiff herself admitted in a February 2008 email to MetLife that she "was extremely depressed," (SCH 791,

792), and Plaintiff's first attorney identified "depression" as one of Plaintiff's disabilities in a June 2008 letter to MetLife, (SCH 638).  MetLife's decision to have Plaintiff's file reviewed by a psychiatrist does not render MetLife's final determination any less accurate.[20]

As to Dr. Varpetian, a physician board-certified in internal medicine and neurology, Plaintiff argues that the report is "based upon incomplete evidence" as Dr. Varpetian "was not provided with Ms. Schlenger's Medical Treatment Reports and Attending Physician Statement," and MetLife failed to inform Dr. Varpetian of new information from IBM indicating that Plaintiff's job required sitting for 90 percent of an 8-hour day.  (Pl.'s Opp'n (ML) 12.)  As to the MTRs and Attending Physician Statement, Plaintiff does not identify any information contained in those reports that was not in review materials Dr. Varpetian did consider.  Those reports were submitted by Dr. Cruciani, and Dr. Varpetian reviewed all of Dr. Cruciani's progress notes during the same time period, and even spoke to Dr. Cruciani.  (SCH 304–05.)  As to the "new" information from IBM regarding Plaintiff's job requirements, MetLife obtained that information from IBM after Dr. Varpetian had completed her report.  Dr. Varpetian's conclusion was that "[t]he medical information does not support any neurological condition that may cause functional limitations beyond 02/23/08."  Dr. Varpetian's report does not state that it is based on any particular understanding of Plaintiff's job requirements, and Plaintiff has failed to identify how the "new" information would change Dr. Varpetian's conclusion.  Further, Plaintiff's mere job title would make clear the general nature of her work.  Plaintiff further argues that Dr. Varpetian's report is "deficient" because she reviewed Dr. Rubens's report, as well as the

---

[20] Plaintiff disavowed any psychiatric basis for her disability claim.  (*E.g.*, SCH 192 (Aug. 22, 2008 letter from Plaintiff's counsel indicating that "Ms. Schlenger has not even asserted that a psychiatric condition has caused her disability, nor have her doctors."); Am. Compl. ¶ 90 (Plaintiff "*never* alleged a psychiatric condition as the cause or condition of her physical disability") (emphasis in original); Pl.'s 56.1 (ML) ¶¶ 134, 136, 170.)

"inaccurate" surveillance report.[21]  I find no reason why Dr. Varpetian was not entitled to review

Dr. Rubens's report.  As to the surveillance report, the results were "unremarkable" and it does

not appear that Dr. Varpetian placed much weight on its findings.  Indeed, Dr. Varpetian only

mentions the findings in two sentences spanning three lines of Dr. Varpetian's six-page, single-

spaced report.  I do not find that the contents of the surveillance report had a substantial or even

appreciable impact on Dr. Varpetian's conclusions, which focused on the "[e]xtensive medical

records show[ing] that [Plaintiff] has complained of pain without any corresponding objective

findings."  (SCH 308.)  Finally, Plaintiff argues that Dr. Varpetian's report disregarded

Plaintiff's subjective complaints of pain, omitting a portion of a report by one of Plaintiff's

physicians, Dr. Kanner, that "described the limitations and effects of Ms. Schlenger's neck pain,

right shoulder pain, low back, hip and thigh pain on her functioning."  (Pl.'s Opp'n (ML) 13.)

Dr. Varpetian's report indicates otherwise.  The report specifically lists Dr. Kanner's records (in

addition to those of many other physicians) in the list of "records provided for review," and also

provides a short summary of Dr. Kanner's findings, including Plaintiff's complaints of "pain in

her neck into shoulders, right shoulder pain, low back and hip pain and thigh pain," although

"[a]t the time of [Dr. Kanner's] evaluation, [Plaintiff's] pain level was 0/10," thanks to

Oxycontin.  (SCH 304, 307.)

     Fifth, Plaintiff argues that MetLife failed to explain its reasons for discrediting Plaintiff's

physicians' opinions.  (Pl.'s Opp'n (ML) 6–9, 13.)  Specifically, Plaintiff argues that MetLife's

analysis of Plaintiff's claim "is devoid of any findings by Drs. Barrick, Neuwirth, or Hansraj; it

---

[21] Plaintiff's argument that Dr. Varpetian's report is flawed because, among other things, she relied on the surveillance report, which Plaintiff claims is "inaccurate," (Pl.'s 56.1 (ML) ¶ 140; Pl.'s Opp'n (ML) 11–12), is belied by Plaintiff's letter appealing MetLife's initial denial of her LTD benefits where she argued that MetLife's determination was flawed because, among other things, "[t]he Denial Letter fail[ed] to mention the investigator's report" and "the investigator's report supports Ms. Schlenger's disability claim."  (SCH 500.)  Further, Plaintiff cites her own declaration, (Doc. 57), in support of her claim that the surveillance report is "inaccurate," but that declaration is outside the administrative record, and thus, I may not consider it, absent good cause which is not present here, in deciding whether MetLife's determination was arbitrary and capricious.

further omits the findings of Drs. Kanner and O'Leary regarding Ms. Schlenger's pain, the functional limitations of the same, and the myelogram." (*Id.* at 13.)  There is no dispute that in addition to Dr. Cruciani, Plaintiff also consulted with Drs. Patrick O'Leary, William Barrick, Ronald Kanner, Michael Neuwirth, and Kenneth Hansraj.  (SCH 651–756.)  Although Plaintiff submitted multiple medical reports from these latter doctors in support of her claimed disability, only two of them even identified Plaintiff as being "disabled" or having a "disability," one in a single sentence of a three-sentence report, and the other by describing Plaintiff as temporarily disabled from work in the summer of 2005 following her hospitalization.  (*Compare* SCH 740, 653, 655, *with* SCH 611–17, 657–59, 717–21.)  Moreover, MetLife's determination was supported by the reports of three independent physicians, Drs. Rubens, Sugerman, and Varpetian.  MetLife was "not required to accord special deference to the conclusions of [Plaintiff's] physicians." *Durakovic*, 609 F.3d at 141; *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").  Indeed, "when faced with a conflict between the opinion of the treating physician and the opinions of reviewing doctors and independent consultants, it is not arbitrary and capricious for the plan to prefer the reviewing doctors." *Mugan*, 2011 WL 291851, at *9 (internal citations omitted).

Moreover, MetLife did consider Plaintiff's physicians' findings.  For instance, as to Drs. O'Leary and Barrick, their reports were reviewed and considered by Drs. Rubens and Varpetian, whose reports were discussed in MetLife's denial letter, and the "X-rays upon which Dr. O'Leary's [and Dr. Barrick's] findings were based are discussed in MetLife's final appeal

determination letter dated November 3, 2008." (ML Ctr. 56.1 ¶¶ 233, 236;[22] SCH 147–51, 199–204, 640–44.) The final appeal determination letter also discussed Dr. Kanner's findings, including that Plaintiff "has had pain in her neck, right shoulder, low back pain, as well as bilateral hip and thigh pain." (SCH 148–150.) Although MetLife's final denial letter, dated November 3, 2008, does not mention Dr. Neuwirth's or Dr. Hansraj's findings, MetLife's final denial letter refers to Dr. Varpetian's report, which in turn discusses Dr. Neuwirth's and Dr. Hansraj's findings. (SCH 147–51.) Based on the administrative record before this Court, I do not find that MetLife ignored Plaintiff's physicians' findings, and to the extent MetLife departed from Plaintiff's physicians' findings, I find that MetLife permissibly credited its IPCs' opinions.

Sixth, Plaintiff argues that MetLife disregarded the SSA's determination that Plaintiff was disabled. Although MetLife may consider the SSA's determination, it is not binding on MetLife. *See Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006); *see also Billinger v. Bell Atl.*, 240 F. Supp. 2d 274, 285 (S.D.N.Y. 2003) (Although SSA determination "is evidence, it is but one piece of evidence, and is far from determinative" as "Social Security determinations are not binding on ERISA plans . . . .") (internal quotation marks omitted). Plaintiff concedes as much. (Pl.'s Opp'n (ML) 16 (SSA's determination "does not bind either the ERISA Plan or the district court").) In MetLife's appeal denial letter, MetLife specifically noted that "the awarding of Social Security disability benefits does not guarantee the approval or continuation of disability benefits under the Plan. The Social Security Administration's determination is separate from, governed by different standards and in no way affiliated with MetLife's review and determination of your client's claim." (SCH 150.) Further, the SSA award, which is part of the administrative record, does not provide an explanation for its

---

[22] "ML Ctr. 56.1" refers to MetLife's Counterstatement to Plaintiff's Rule 56.1 Supplemental Statement of Material Facts, filed August 27, 2010. (Doc. 64.)

determination, and in any event, is not proof of Plaintiff's disability.  *See Durakovic*, 609 F.3d at

141 (no requirement "to accord special deference to the determination of the Social Security

Administration"); *Pagan v. Nynex Pension Plan*, 846 F. Supp. 19, 21 (S.D.N.Y. 1994) ("Social

Security determinations are likewise not binding on ERISA plans . . . ."), *aff'd*, 52 F.3d 438 (2d

Cir. 1995).  Thus, I find that MetLife did not act arbitrarily or capriciously in its treatment of the

SSA's determination.

Seventh, Plaintiff argues that MetLife is both the insurer and adjudicator of claims under

the LTD plan, presenting a structural conflict of interest.  I have found that MetLife had a

structural conflict of interest because MetLife both determined the validity of an employee's

claims under IBM's LTD Plan and was responsible for paying benefits to claimants, *see Mugan*,

2011 WL 291851, at *10, and I weigh this conflict of interest as a factor in assessing whether

MetLife's determination was arbitrary and capricious.  In determining how much weight to

accord the conflict, I am "mindful that '[n]o weight is given to a conflict in the absence of any

evidence that the conflict actually affected the administrator's decision.'"  *Id.* (quoting *Kelly v.

Handy & Harman*, No. 10-0718, 2011 WL 159601, at *1 (2d Cir. Jan. 19, 2011)).  Considering

the evidence before this Court, I find that any potential conflict played a minimal role in

MetLife's denial of Plaintiff's LTD benefits.  Plaintiff's claim was reviewed by three IPCs

whose decisions support MetLife's denial.  Plaintiff's treating physician was given ample

opportunities to state his views, and the views reflected by the other doctors who treated Plaintiff

were also considered.  Plaintiff suggests that a comment made in connection with MetLife's

decision to order surveillance on Plaintiff's home shows the effect of the conflict.  The context,

however, shows that that decision was based on many factors.  The claim log indicates that

MetLife held a "team meeting" after Dr. Rubens concluded that "medical does not support

[Plaintiff's] inability to perform her sedentary job, [and] also recommend[ed] non clinical action be taken on claim if his judgment is questioned." (SCH 108; *see* SCH 839.) After the "team meeting, [MetLife] decided to order SIU [surveillance investigative unit] to close claim solidly. We would like 3 days of SIU asap if possible, base benefit is large as well and [employee] transitions in March 2008." (SCH 108.) In context, the comment that Plaintiff's base benefit is large seems to have been an internal justification for spending the money on three days of surveillance, not a reason for denying coverage as Plaintiff contends. Moreover, the fact that MetLife recognized that Plaintiff's base benefit is large—undoubtedly not an uncommon situation—was not the reason for ordering the surveillance, and alone does not indicate that MetLife's conflict actually affected MetLife's decision to deny Plaintiff's LTD benefits. As noted above, MetLife's decision is consistent with the determination of three IPCs.[23]

For the foregoing reasons, under the "deferential" standard I must apply, *Glenn*, 554 U.S. at 115, I find that MetLife's decision to deny benefits was not "without reason, unsupported by substantial evidence or erroneous as a matter of law," *Pagan*, 52 F.3d at 442 (internal quotation marks omitted). Thus, MetLife's conclusion was not arbitrary and capricious. MetLife's Motion for Summary Judgment dismissing Count Three is GRANTED; Plaintiff's cross-motion as to Count Three is DENIED.

---

[23] Plaintiff also implies in the Amended Complaint, (Am. Compl. ¶¶ 77–81), although she does not so argue in opposition to MetLife's motion for summary judgment, that MetLife was influenced by the fact that 24-month cap on her claim was being removed. She was notified of that removal on June 27, 2007, (SCH 540), and says that "[a]lmost immediately," (Am. Compl. ¶ 78), MetLife sought additional information on her claim. That information was in fact sought on July 19, 2007 and July 20, 2007, (SCH 542–43), so the implication that might arise from "immediate" action is diluted. Moreover, there is no indication that the July inquiries were not routine. In any event, however, to the extent the sequence of events indicates a heightened awareness on MetLife's part of its possible financial exposure from approval of Plaintiff's claim, that awareness is consistent with my finding that MetLife had a structural conflict of interest, that had minimal, though not non-existent, influence on its decision-making. Even taking its heightened awareness into account, MetLife's decision was not arbitrary and capricious, given that it relied on outside professionals and the absence of objective support for Plaintiff's condition, and was reached after giving Plaintiff's treating doctor numerous opportunities to state his case.

<u>Count Four—Breach of Fiduciary Duty</u>

Defendants MetLife and Fidelity move for summary judgment dismissing Count Four of Plaintiff's Amended Complaint, which alleges that Defendants breached their fiduciary duty to Plaintiff resulting in the loss of life insurance and health coverage for Plaintiff and her family. (Am. Compl. ¶¶ 132–38.)  Plaintiff's "Prayer for Relief," requests, among other things, "[a]n order enforcing the right of Ms. Schlenger's family to continuing medical insurance coverage," and "[i]ssuance of substitute policies of life insurance without need for physical examination, in value and coverage comparable to those lost as set forth above."  (Am. Compl. at 29 (Prayer for Relief ¶¶ D, F).)[24]  Although Plaintiff's Amended Complaint does not specifically identify the ERISA section pursuant to which she brings Count Four, Plaintiff's Memorandum of Law in Opposition to Fidelity's Motion for Summary Judgment indicates that she asserts Count Four pursuant to Section 502(a)(3).

**MetLife**

Plaintiff's claim against Defendant MetLife fails.  First, although MetLife moved for summary judgment on Count Four, Plaintiff did not address Count Four in her Opposition to MetLife's Motion for Summary Judgment, and on this basis alone, those claims are deemed abandoned and summary judgment could be granted in MetLife's favor.  *See Marache v. Akzo Nobel Coatings, Inc.*, No. 08-11049, 2010 WL 908467, at *15 (S.D.N.Y. Mar. 12, 2010) (finding claim abandoned by virtue of plaintiff's failure to address it in opposition to defendant's summary judgment motion) (collecting cases); *Arias v. Nasdaq/Amex Mkt. Grp.*, No. 00-9827, 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003) (dismissing claims as "abandoned" where

---

[24] Within Count Four, plaintiff asks the court to order Fidelity "to immediately cease its threatened termination of [Plaintiff's] medical insurance benefits and restore her previous status as an insured under the IBM medical insurance plans," (Am. Compl. ¶ 135), or "[i]n the alternative, Fidelity should be ordered to apply the severance benefit subsidy to the amounts claimed to be due and payable and forward for the period to which [Plaintiff] is entitled as an employee."  (Am. Compl. ¶ 138.)

plaintiff's summary judgment opposition "neither refute[d] nor even mention[ed]" defendant's argument for summary judgment on two of his claims); *see also* Local Civ. R. 7.1 ("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to the motion . . . . Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default.")

Second, and notwithstanding the foregoing, I have considered Count Four as alleged against MetLife, and find that MetLife is correct that the claim fails as a matter of law. Count Four concerns Plaintiff's coverage under IBM's life and health insurance plans, and MetLife is not the plan administrator, fiduciary, or insurer of those plans. MetLife is the "claim fiduciary and insurer" of IBM's LTD Plan. (ML Mem. 25.) MetLife therefore is not a proper defendant as to Count Four, which relates to the health and life insurance plans. *See Ranno* v. *Hartford Life & Acc. Ins. Co.*, No. 09-7440, 2010 WL 2194526, at *4 (S.D.N.Y. May 14, 2010); *Steger v. Delta Airlines, Inc.*, 382 F. Supp. 2d 382, 387 (E.D.N.Y. 2005).

Thus, MetLife's Motion for Summary Judgment dismissing Count Four is GRANTED, and Plaintiff's Cross-Motion for Summary Judgment on Count Four is DENIED.

**Fidelity**

As to Defendant Fidelity, Count Four also fails. Plaintiff claims in her opposition brief that she brings Count Four under Section 502(a)(3) of ERISA, which permits Plaintiff to seek "appropriate equitable relief." (Pl.'s Opp'n (Fid) 3–4.) Specifically, Plaintiff seeks "[a]n order enforcing the right of Ms. Schlenger's family to continuing medical insurance coverage" and "[i]ssuance of substitute polices of life insurance without need for physical examination, in value and coverage comparable to those lost." (Am. Compl. at 29 (Prayer for Relief).) Plaintiff may seek such relief against the Plan Administrator of IBM's medical and life insurance plans

pursuant to Section 502(a)(1)(B); thus, it is not "appropriate equitable relief" under Section 502(a)(3). *See, e.g.*, *Varity*, 516 U.S. at 515 ("where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate'"); *Klecher*, 331 F. Supp. 2d at 286–88 (collecting cases); *Rubio v. Chock Full O'Nuts Corp.*, 254 F. Supp. 413, 431–32 (S.D.N.Y. 2003) (normal denial of benefits case can be brought under 502(a)(1)(B), thus claim under 502(a)(3) dismissed). In *Varity*, the Supreme Court allowed the plaintiffs' claim against their employer for breach of fiduciary duty under Section 502(a)(3) where the employer had lied and misrepresented facts regarding the employees' entitlement to benefits if they transferred to another plan. 516 U.S. at 494–95. Because Section 502(a)(3) was the *Varity* plaintiffs' only available avenue of relief, the Court held that the plaintiffs could proceed under Section 502(a)(3). *Id.* Here, unlike in *Varity*, Plaintiff does not claim that Fidelity deceived her. Instead, Plaintiff alleges that she lost her insurance coverage because MetLife, not Fidelity, denied her LTD benefits claim. (Am. Compl. ¶¶ 82, 94, 131–38.) Further, Plaintiff's Amended Complaint alleges that her STD benefits were miscalculated because IBM, not Fidelity, refused to allow her to work flex hours and because of inaccuracies in medical treatment reports maintained by IBM, not Fidelity. (Fid. Mem. 10 (citing Am. Compl. ¶¶ 56–59).) Thus, Plaintiff "is not similarly situated to other plaintiffs appealing to *Varity's* framework, who were lied to by their employer and/or plan administrator." *Klecher*, 331 F. Supp. 2d at 287 (Section 502(a)(3) fiduciary duty claim not permitted against employer where plaintiff alleged that employer provided incorrect information to insurer, insurer denied plaintiff's application for benefits, and plaintiff thought decision was improper).

Thus, Fidelity's Motion for Summary Judgment dismissing Count Four is GRANTED.

<u>Claims against Fidelity under 502(a)(1)(B), 502(a)(2), and 502(c)</u>

To the extent Plaintiff's Amended Complaint brought claims against defendant Fidelity based on Sections 502(a)(1)(B), 502(a)(2) and 502(c) of ERISA, this Court enters summary judgment dismissing those claims. Not only does Plaintiff not address Fidelity's arguments about claims pursuant to those Sections, *see* pages 44–45 above, but Plaintiff explicitly contends that its claims against Fidelity arise only under Section 502(a)(3). (*E.g.*, Pl.'s Opp'n (Fid) 1, 3, 14–15.)[25] Thus, to the extent Plaintiff's Amended Complaint brought claims under Sections 502(a)(1)(B), 502(a)(2), and 502(c) of ERISA against Fidelity, summary judgment is GRANTED in favor of Fidelity and such claims are dismissed.

<u>Attorney's Fees</u>

Defendant Fidelity seeks an award of attorneys' fees and costs incurred in defending Plaintiff's claims asserted against it (Counts Two and Four). Plaintiff seeks an award of attorneys' fees and costs incurred in prosecuting its claims against MetLife (Counts One, Two, Three, and Four). Both requests are denied.

The district court has discretion under Section 502(g)(1) of ERISA to award attorneys' fees and costs to either party. 29 U.S.C. § 1132(g)(1); *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir. 1987). In considering whether to grant such a request, the court should consider:

> (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Chambless*, 815 F.2d at 871.

---

[25] I thus need not address, among other things, whether Fidelity exercised discretionary authority or could otherwise be considered a *de facto* plan administrator, potentially subjecting it (in addition to MetLife) to suit under Section 502(a)(1)(B).

Considering all five *Chambless* factors, I find that neither Fidelity nor Plaintiff is entitled to an award of attorneys fees.  "[W]hen fees are sought by a prevailing defendant [such as Fidelity], courts, including our Court of Appeals, have frequently concluded that the factors ordinarily slant in favor of the plaintiff and militate against an award of fees."  *Mahoney v. J.J. Weiser & Co.*, 646 F. Supp. 2d 582, 590 (S.D.N.Y. 2009).  With respect to Fidelity's claim for attorneys fees from Plaintiff, I find that Plaintiff did not act in bad faith, Plaintiff had colorable claims against Fidelity, Plaintiff's ability to satisfy an award of attorneys fees is questionable, and awarding attorneys fees to Fidelity likely would chill valid claims of other participants while deterring few frivolous claims.  As to Plaintiff's request for attorneys' fees from MetLife, only the second factor (the ability of the offending party to satisfy an award of attorneys fees) militates in favor of Plaintiff's requested fee award.  The remaining factors counsel otherwise. First and foremost, MetLife successfully defended against Plaintiff's claims and prevailed on its counterclaim against Plaintiff.  Further, MetLife did not act in bad faith, and awarding attorneys fees where Plaintiff did not prevail might encourage baseless lawsuits.  Weighing all the factors, I conclude that neither Fidelity nor Plaintiff is entitled to an award of attorneys fees.

### III.   IBM'S MOTION TO DISMISS

#### A.   <u>Standard of Review</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

In considering whether a complaint states a claim upon which relief can be granted, the court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determine whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

As earlier noted, in considering IBM's Motion to Dismiss, I consider the allegations of the Amended Complaint, not the additional facts the other parties have proffered in their motions for summary judgment.

**B.     Analysis**

Count Five—Fraudulent Inducement

IBM argues that Count Five, which alleges that Plaintiff was fraudulently induced to accept employment with IBM by promises that she would receive variable pay at a rate of 10% of her salary per year and would receive a relocation package enabling her and her family to "comfortably relocate to New York," (Am. Compl. ¶ 140), should be dismissed because (1) it is time-barred, and (2) even if not time-barred, the claim fails to comply with Rule 9(b)'s particularity requirement.  (IBM Mem. 2–8.)[26]

IBM argues that New York's borrowing statute, C.P.L.R. Section 202, applies.  That statute provides:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

"Under C.P.L.R. § 202, when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either:  (1) New York; or (2) the state where the cause of action accrued." *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998).  The statute of limitations for fraudulent inducement in New York is six years, *see* C.P.L.R. § 213; in Massachusetts, it is three years, *see* Mass. Gen. Laws ch. 260, § 2A.  "To determine where a cause of action accrued in a

---

[26] "IBM Mem." refers to Defendant IBM's Memorandum of Law in Support of its Motion to Dismiss the Claims Against It.  (Doc. 34.)

fraud case, the test is not where the misrepresentations were made, or other factors relevant to the fraudulent activity itself, but where the loss resulting from the misrepresentation was sustained." *Maiden v. Biehl*, 582 F. Supp. 1209, 1212 (S.D.N.Y. 1984) (internal quotations marks omitted). When the alleged injury of the fraud is economic, as here, "the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Smith v. Soros*, No. 02-4229, 2003 WL 22097990, at *4 (S.D.N.Y. Sept. 5, 2003) (internal quotation marks omitted). In other words, "the question is always where the plaintiff felt the economic impact of the fraud." *Maiden*, 582 F. Supp. at 1212. If Plaintiff was induced by fraud to enter into an employment contract, "a right to sue accrued on that date." *Id.* at 1213.

The parties dispute whether the borrowing statute applies and what date the cause of action accrued. IBM argues that Plaintiff resided in Massachusetts (and therefore was an out-of-state resident) when she signed IBM's Offer of Employment letter on November 5, 2003; that as a result, C.P.L.R. Section 202 dictates that the Massachusetts three-year statute of limitations applies, rendering the claim untimely; and that even if New York's six-year statute of limitations applies, the claim is still untimely because the Complaint was filed more than six years after November 5, 2003. Plaintiff contends that the borrowing statute is inapplicable and New York's general choice-of-law principles require application of New York's six-year statute of limitations because Plaintiff was a New York resident when the cause of action accrued, which she argues is when she relocated to a rental apartment in New York on or around November 28, 2003, and began incurring rental and moving costs.

The parties do not dispute that there was a contract between Plaintiff and IBM, but rather disagree about when the contract was formed. That date will determine whether Plaintiff's fraudulent inducement claim is timely. IBM submits that the operative date is November 5, 2003

(when Plaintiff signed the Offer of Employment, (*see* Bloom Aff.,[27] Ex. A));[28] Plaintiff argues

that the date is no sooner than November 28, 2003, when she moved to New York and incurred

costs. IBM's position, that the contract was formed when Plaintiff signed the agreement, is

undermined by the terms of the offer, which clearly state that "this offer is contingent upon the

following" and lists several things that Plaintiff and/or IBM would need to do to complete the

agreement. (*Id.*) For instance, Plaintiff needed to complete an Application for Employment and

Security Data Sheet, sign an agreement regarding confidential information and intellectual

property, and sign a form on her first day of employment regarding IBM's drug policy; IBM

needed to complete the pre-employment process, which required verification of Plaintiff's

application materials and that she was free from any applicable non-compete agreements. (*Id.*)

By their very language these requirements seem to be conditions precedent to the formation of

the contract, because of which no contract arises "unless and until the condition occurs."

---

[27] "Bloom Aff." refers to the Affirmation of Allan S. Bloom, filed March 29, 2010, in support of IBM's Motion to Dismiss. (Doc. 33.)

[28] On a motion to dismiss, the Court ordinarily must limit its consideration to the facts stated on the face of the complaint or in documents appended to the complaint or incorporated by reference therein, and to matters of which judicial notice may be taken. *See Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999). "To be incorporated by reference, the [c]omplaint must make a clear, definite and substantial reference to the documents." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). In addition, even if a document is not attached or incorporated by reference, if the complaint "solely relies" on it and it is integral to the complaint, the Court may consider that document in ruling on the motion. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *see Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005) ("[I]t is well-established that the court may consider a document, even if not attached or incorporated by reference, where the complaint relies heavily upon its terms and effect, thus rendering the document integral to the complaint.") (internal quotation marks omitted). Where a plaintiff has actual notice and has relied upon a document in framing the complaint, the Court may consider the document without converting the Rule 12(b)(6) motion into a motion for summary judgment under Rule 56. *See Munno*, 391 F. Supp. 2d at 268.

Here, Defendant has submitted a letter, dated November 3, 2003, offering Plaintiff employment as a Senior Contract Specialist, and an attachment outlining terms of employment, which Plaintiff signed on November 5, 2003. (Bloom Aff., Ex. A.) Because I find that Plaintiff had actual notice of these documents (as evidenced by her signature) and relied on them in drafting her complaint (*see, e.g.*, Am. Compl. ¶¶ 33, 39, 46, 47, 140 (referencing variable pay, which is discussed in the attachment signed by Plaintiff)), and relied on them in her Opposition to the Motion to Dismiss, (Pl.'s Opp'n (IBM) (Doc. 36) at 6–7 (referring to the Offer Letter)), I find these documents integral to the Amended Complaint, and will therefore consider them on this Motion to Dismiss.

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995) (internal quotations marks omitted).

On the other hand, the Amended Complaint provides no facts about when and if these conditions were fulfilled, contains no mention of the date November 28, 2003 (when Plaintiff argues she moved to New York and began incurring expenses), and states only that Plaintiff began working for IBM on December 1, 2003.  (Am. Compl. ¶ 44.)  The Amended Complaint does not provide facts as to where and when Plaintiff resided when losses resulting from the alleged misrepresentations of IBM were sustained (or at least began to be sustained).  Absent those facts, I am unable to determine where and when Plaintiff's claim accrued, which will in turn determine whether the borrowing statute applies, and which state's statute of limitations applies.

Even assuming, however, that the claim is timely, it still fails because it does not comply with Federal Rule of Civil Procedure 9(b), which imposes a heightened pleading standard for allegations of fraud.  A party alleging fraud "must state with particularity the circumstances constituting fraud or mistake," but may allege "generally" the "conditions of a person's mind."  Fed. R. Civ. P. 9(b).  To plead with the requisite specificity, "the complaint must:  (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).  "[A]llegations of false representations must be attributed to specific defendants," and "a claimant must allege facts that give rise to a strong inference of fraudulent intent."  *Rodriguez v. It's Just Lunch, Int'l*, No. 07-9227, 2010 WL 685009, at *5 (S.D.N.Y. Feb. 23, 2010) (internal quotation marks omitted).  "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show

that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

Here, Plaintiff has not alleged facts that meet the required degree of specificity or that demonstrate knowledge or scienter by IBM.  Plaintiff alleges generally that "IBM representatives" or "representatives of IBM" made the representations to her that form the basis of her claim for fraudulent inducement, (Am. Compl. ¶¶ 32, 33); that IBM and its relocation agent Cendant failed to provide her with the "promised relocation plan," (*id.* at ¶¶ 35, 36); and that this conduct occurred during the "hiring process," (*id.* at ¶¶ 33).  Plaintiff's failure to name individuals, identify detailed statements, or identify particular dates makes clear that as pleaded this claim lacks the specificity required by Rule 9.  *See, e.g.*, *Ben Hur Moving & Storage, Inc. v. Better Bus. Bureau*, No. 08-6572, 2008 WL 4702458, at *4 (S.D.N.Y. Oct. 3, 2008) ("The plaintiff's complaint fails [the Rule 9(b)] standard because the allegations in the complaint do not specify the time, place, [or] speaker . . . of the misrepresentations that were allegedly made through the mails and over the Internet."); *Armored Grp., LLC v. Homeland Sec. Strategies, Inc.*, No. 07-9694, 2009 WL 1110783, at *1 (S.D.N.Y. Apr. 21, 2009) (dismissing fraudulent inducement claim where plaintiff "does not identify the location where the misrepresentations were made . . . does not provide exact dates for the statements . . . and fails to sufficiently identify who the speaker is concerning each statement") (internal quotation marks and citations omitted).  While Plaintiff seems to fault Cendant (apparently a relocation firm hired by IBM) for conduct after her move, (Am. Compl. ¶¶ 35–36), she has not specified what pre-employment promise Cendant breached, let alone that the promise (whatever it was) was made with the expectation that Cendant would not perform.  In addition, the closest Plaintiff comes to

articulating either knowledge or scienter are the statements attributed to Ronald Rinner and

Joyce Koontz in response to Plaintiff's complaints about the moving process and these

statements were made after Plaintiff had begun working for IBM.  (*Id.* at ¶¶ 40, 41.)  The alleged

statement by Rinner ("It got you here didn't it?  So sue us." (*id.* at ¶ 41)), could conceivably be

read as an admission that IBM recruited Plaintiff by promising her more in relocation assistance

than she actually received[29]—although it would be a real stretch to read it as an admission that

IBM made the promise with the intent not to perform and to trick Plaintiff into becoming its

employee—but it also could be simply a remark to the effect that the relocation had in fact been

adequate.  Indeed, it is not clear from the Amended Complaint what the "it" in the alleged

statement refers to—the alleged promises about the relocation process, the employment package

as a whole, the real estate market, or something else.  The statement thus does not raise a strong

inference of fraudulent intent.  Likewise, the alleged statement by Koontz ("Everyone loses an

average of $30,000 when they relocate.  So?" (*id.*)), appears to be simply an observation.  It, too,

fails to give rise to a strong inference of fraudulent intent.[30]

I thus find that Plaintiff has not pleaded sufficient facts to make out a claim for fraudulent

inducement, and this claim should accordingly be dismissed.  Rule 15(a) of the Federal Rules of

Civil Procedure directs that leave to amend a pleading "shall be freely given when justice so

requires," Fed. R. Civ. P. 15(a); *see State Teachers Ret. Bd. v. Fluor Corp.,* 654 F.2d 843, 856

(2d Cir. 1981), and the Supreme Court has stated that absent "undue delay, bad faith or dilatory

motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of

allowance of the amendment" or "futility of amendment," leave should "be 'freely given,'"

---

[29] Plaintiff does not make clear in the Amended Complaint how her actual benefits differed from those set out in the attachment to Plaintiff's offer of employment.

[30] The Court is unable to find anything in the Amended Complaint even arguably suggesting fraudulent intent with respect to the variable pay.  Plaintiff alleges only that she was promised but did not receive it.  That might amount to a breach of contract, but it is insufficient for fraudulent inducement.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).  While Plaintiff has already amended once, she has not amended as to Defendant IBM (which was added as a Defendant with the first amendment). In light of the preference for allowing amendment, therefore, I will also grant Plaintiff leave to amend as to this claim to allow her the opportunity to add, if possible, facts that will resolve the deficiencies identified above.  If Plaintiff chooses to amend, she also should specify exactly how the pay and benefits she ultimately received differ from what she was promised before she was induced to become an IBM employee.  Further, Plaintiff should make clear why the circumstances amount to fraudulent inducement, as opposed to mere breach of contract.  *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) (falsely indicating intent to perform not sufficient for fraud claim under New York law); *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986) (promises regarding future acts give rise only to breach of contract claims; fraudulent inducement requires misrepresentation of present fact).  Plaintiff should also allege facts showing how it could be reasonable to rely on pre-employment general promises when they are followed by a specific written contract.  *See, e.g.*, *Republic Nat'l Bank v. Hales*, 75 F. Supp. 2d 300, 315 (S.D.N.Y.1999) (plaintiff precluded from demonstrating reasonable reliance where express provision in written contract contradicts prior alleged oral representation in meaningful way) (collecting cases); *see also L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 186 (S.D.N.Y. 2009) ("A party who enters into a plain and unambiguous contract cannot avoid it by stating that he or she misunderstood its terms.  If a party had the opportunity to review the contracts terms, to not have read it is gross negligence.") (internal quotation marks omitted).

<u>Count Six—Disability Discrimination</u>

The other claim against IBM is for disability discrimination stemming from Plaintiff's alleged wrongful discharge on or around November 14, 2006 and subsequent termination in December 2008, in violation of the New York State Human Rights Law, New York Exec. Law Section 296(1)(a).  (Am. Compl. ¶¶ 20, 147.)  Section 296 provides

> It shall be an unlawful discriminatory practice:  (a) For an employer . . . because of an individual's . . . disability . . . to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

"[A]lthough the definition of disability under § 296 is less restrictive than under the ADA, . . . the requirements of a *prima facie* claim pursuant to the New York Human Rights Law [are] identical to one pursuant to the ADA."  *Ehrlich v. Gatta*, No. 07-11597, 2009 WL 3213715, at *5 (S.D.N.Y. Oct. 5, 2009) (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 n.3 (2d Cir. 2001)).  Thus to make out a *prima facie* case under Section 296, Plaintiff must show: "(1) that she is an individual with a disability within the meaning of the statute; (2) that [Defendant] is subject to the [New York State Human Rights Law] and had notice of the disability; (3) that she was otherwise qualified to perform the essential functions of her position, with or without reasonable accommodation; and (4) that she was fired because of her disability." *Fall v. N.Y. State United Teachers*, 289 F. App'x 419, 420 (2d Cir. 2008).

IBM's argument is that Plaintiff has not pleaded a sufficient claim for disability discrimination under the Supreme Court's rulings in *Twombly*, 550 U.S. 544, and *Iqbal*, 129 S. Ct. 1937, because Plaintiff's allegation "fails to establish any possible connection between her disability and her termination."  (IBM Mem. 9.)  Alternatively, IBM argues that because Plaintiff admits that she "was, is, and remains 'totally disabled' and unable to work"—as she claims in

her claims against the other defendants in the case—she is not protected under Section 296, which requires Plaintiff to prove that she was able to perform her job.  (*Id.* at 10–11.)

IBM's second argument is a red herring, at least in theory.  The Supreme Court in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999), held that a plaintiff may properly claim that she was totally disabled in one context and disabled but able to work with reasonable accommodation in another:  "an ADA suit claiming that the plaintiff can perform her job *with* reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job (or other jobs) *without* it."  *Id.* at 803.  That is, under certain statutes (the ADA and Section 296 of the HRL) the definition of disability takes into account "reasonable accommodations" that enable an individual to work, while others (SSDI, long-term disability insurance) do not.  *See, e.g.*, N.Y. Exec. Law §§ 292(21), 292(21-e).  The distinction drawn by the Supreme Court has been accepted in this district, *see Norville v. Staten Island Univ. Hosp.*, 112 F. App'x 92, 94 (2d Cir. 2004), and has been applied to situations where, as here, a plaintiff brought an ADA claim as well as claims under, among other things, a long-term disability insurance policy, *see Nodelman v. Gruner & Jahr USA Publ'g*, No. 98-1231, 2000 WL 502858, at *8 (S.D.N.Y. Apr. 26, 2000) (examining *Cleveland v. Policy Mgmt. Sys. Corp.* and concluding that "plaintiff is not judicially estopped from claiming that he was qualified for his position at [defendant], even though he represented for purposes of SSDI, LTD, and [workers compensation] that he was 'totally disabled'").

While Plaintiff thus correctly points out that a plaintiff might in theory be disabled for purposes of a LTD plan or social security, and yet able to work with a reasonable accommodation, she has not adequately alleged that *she* was such a plaintiff.  The Amended Complaint does not allege that she sought any accommodation (or invoked the ADA or New

York HRL), either around the time she went on short-term disability in November 2006 or was terminated in December 2008.[31]  *See Evans v. City of N.Y.*, 883 N.Y.S.2d 478, 479 (1st Dep't 2009) (plaintiff failed to show he proposed a reasonable accommodation that defendant refused to make).  She implies that she was able to work at these times and was forced out by IBM, and does not suggest that any accommodation was needed or denied.  Accordingly, while one *may* be disabled for LTD or social security purposes but able to work with accommodations for HRL purposes, Plaintiff seems to allege in the Amended Complaint that she was able to work *without* accommodation for HRL purposes, and was wrongfully prevented from doing so by IBM,[32] at the same time she alleges she was unable to work for LTD and social security purposes.  The latter position would be a seemingly insurmountable hurdle to an HRL claim, which protects only those able to work.  *See* N.Y. Exec. Law § 296(3-a)(g) ("[N]othing contained in this subdivision . . . shall be construed to prevent the termination of the employment of any person who, even upon the provision of reasonable accommodations, is physically unable to perform his or her duties"); *see also Hollander v. Paul Revere Life Ins. Co.*, No. 96-4911, 1997 WL 811531, at *1 (S.D.N.Y. Apr. 21, 1997) ("Plaintiff cannot repeatedly allege in his Complaint that he is 'completely and totally disabled, preventing him from engaging in his . . . occupation' while at the same time claim that he is 'qualified' to perform the essential functions of his job.")

---

[31] Plaintiff acknowledged that she was permitted to work from home (not as an accommodation but because any employee could do so).  (Am. Compl. ¶¶ 53–54, 56.)  She also apparently requested flexible hours at some time between June and November 2005, (*id.* at ¶¶ 48-49), and again after November 2005, (*id.* at ¶ 56; *see id.* ¶¶ 50–53), but by her account she continued to perform well after flex hours were denied, (*see, e.g.*, *id.* at ¶¶ 55, 60), so this accommodation was not necessary for her to perform her job.  The Amended Complaint contains no other mention of accommodations requested or denied.

[32] Plaintiff states in her Memorandum of Law in Opposition to IBM's Motion to Dismiss that as of November 2006, she could have worked had IBM allowed her flexible hours, (Pl.'s Opp'n 14), but this allegation appears nowhere in the Amended Complaint.  She also claims in her Memorandum of Law to have requested flexible hours multiple times, but the paragraph of the Amended Complaint to which she cites refers to a single request, made between June and November 2005, and the Amended Complaint is clear that Plaintiff continued to work successfully without flex hours for at least a year.  Her Amended Complaint also refers in conclusory fashion to continued requests "for flex-hours," (Am. Compl. ¶ 56), and although it does not specify when they were made, the time frame appears to be soon after November 2005, (*see id.* ¶¶ 55–60).  There thus appears to be no allegation that she requested any accommodation in November 2006 or December 2008.

(collecting cases); *Dantonio v. Kaleida Health*, 732 N.Y.S.2d 322, 324 (4th Dep't 2001) ("Plaintiff cannot contend that she was entitled to [disability] benefits on the ground that she was totally disabled . . . and, at the same time, contend that her 'disability' was within the protection of" New York HRL) (internal quotation marks omitted).  It certainly renders significantly less plausible a claim that Plaintiff was terminated because of discrimination, as opposed to inability to work.

Further, IBM's argument that Plaintiff has not sufficiently pleaded a disability claim is well-taken.  Plaintiff may not rely simply on temporal proximity to give rise to an inference of discrimination, *see, e.g.*, *Iverson v. Verizon Commc'ns*, No. 08-8873, 2009 WL 3334796, at *5 (S.D.N.Y. Oct. 13, 2009), because the Amended Complaint reveals that all three of Plaintiff's hospitalizations occurred well before she was allegedly "dismissed" by Lipson on November 24, 2006 and terminated in December 2008; she likewise had been working from home as a result of her diagnoses and hospitalizations since about November 2005.  (*See* Am. Compl. ¶¶ 48, 50, 53–55, 58–63, 67.)  The allegations regarding Lipson's "six month harassment campaign," (*id.* ¶ 64), are conclusory and strike the Court as the kind of "labels and conclusions" that are insufficient to survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.[33]  Plaintiff has failed to put forward well-pleaded factual allegations that allow this Court to draw the inference that Plaintiff was terminated under circumstances that give rise to an inference of discrimination based on her disability, because "[w]hile there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision, a plaintiff cannot simply rely on the fact that she was terminated.  Rather, she must point to facts that suggest the termination was motivated, at least in part, by animus based on her alleged disability." *Vinokur*

---

[33] Plaintiff claims she was reviewed out of cycle, (Am. Compl. ¶ 64), but she has not alleged that there was no justification for that review.

*v. Sovereign Bank*, 701 F. Supp. 2d 276, 291 (E.D.N.Y. 2010) (internal quotation marks and alterations omitted).

Indeed, by Plaintiff's account it seems that her termination was a simple result of her inability to work.  If she means to claim that she could have worked had IBM accommodated her at the relevant times, she has not said so.  If she means to claim that she could have worked but chose not to for fear of prejudicing her LTD claim, (*see* Am. Compl. ¶ 68), that would not be disability discrimination by IBM.  If she means to claim that she could have worked without accommodation but was wrongfully prevented from doing so by IBM, that might be disability discrimination by IBM, but would be flatly contradicted by her position that she was entitled to LTD because she was not in fact able to work.

This Court accordingly finds that Count Six should also be dismissed, but for the reasons stated above with respect to Count Five, will give Plaintiff the opportunity to amend the Amended Complaint as to this claim to clarify her position and add whatever factual allegations she can advance in good faith that might show that her termination was in fact motivated by discriminatory animus.  It is quite possible that with a more coherent timeline, more details and a clear theory, Plaintiff will be able to allege a HRL claim that would survive a Motion to Dismiss, but the allegations as presently advanced fall short.

IV.     **Conclusion**

For the reasons stated herein, MetLife's Motion for Summary Judgment is GRANTED, Plaintiff's Cross-Motion for Summary Judgment on her claims against MetLife is DENIED; Plaintiff's Motion for an Award of Attorney's Fees and Costs is DENIED; Fidelity's Motion for Summary Judgment is GRANTED; Fidelity's Motion for an Award of Attorney's Fees and Costs is DENIED; and IBM's Motion to Dismiss is GRANTED, but Plaintiff has leave to amend as to her claims against IBM only.  The Clerk of Court is respectfully directed to terminate the pending motions.  (Docs. 32, 42, 47.)

The Second Amended Complaint shall be filed within twenty-one (21) days of the date of this order.  A status conference will be held on **Wednesday, May 18, 2011, at 4:00 p.m.**  If IBM wishes to move to dismiss the Second Amended Complaint, it should send a pre-motion letter two weeks in advance, and Plaintiff shall reply one week in advance, of the status conference.


**SO ORDERED.**

Dated: March 31 , 2011
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

62