UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUSAN AMY SCHLENGER,

                                              Plaintiff,                  09-CV-3986 (CS)

          - against -
                                                                          **OPINION**
IBM CORPORATION and GARY LIPSON,        **AND ORDER**

                                          Defendants.

---

Appearances:

Lisa R. Lipman
New Rochelle, New York
*Counsel for Plaintiff*

Gail I. Auster
Law Offices of Gail I. Auster & Associates, P.C.
New York, New York
*Counsel for Plaintiff*

Allan S. Bloom
Erin E. Laruffa
Paul, Hastings, Janofsky & Walker LLP
New York, New York
*Counsel for Defendant IBM Corporation and Gary Lipson*

Seibel, J.

       Before the Court is the Motion of Defendants International Business Machines Corporation ("IBM") and Gary Lipson to Dismiss Plaintiff's Fourth Amended Complaint ("FAC") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), and failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b). (Doc. 92.) For the reasons stated herein, Plaintiff's federal claims are dismissed with prejudice and her state claims are dismissed without prejudice.

1

**I.     BACKGROUND**

I assume the facts (but not the conclusions) as alleged in the FAC to be true. While I will only briefly summarize the facts, I have read and considered all of the allegations in the FAC and I assume the parties' familiarity with them.

   A.  Pre-Employment

Plaintiff is an attorney who previously resided and practiced in Massachusetts. (FAC ¶ 7.) She was recruited by representatives of IBM starting in October 2003 to work in its Business and Government Relations Division as a Senior Contracts Professional at their facility in Yorktown, New York. (*Id.* ¶ 9.) Plaintiff alleges that during the recruitment process, IBM representatives Ronald Rinner and Joyce Koontz represented to her that, among other things:

- The relocation company used by IBM was "excellent" and they had "no doubt" the company would be able to sell her farm property, (*id.* ¶ 16.b);

- Whether she worked from home or in the office would be "primarily" up to Plaintiff, (*id.* ¶ 16.d);

- A "very important part" of Plaintiff's compensation would be variable pay, which was adjusted based on the department meeting its goals, (*id.* ¶ 16.g);

- She would not incur "high temporary housing costs" because finding a "suitable family home" would be "easy," (*id.* ¶ 16.i); and

- Her relocation package would include an equity advance out of her present home that she could use to make a down payment on a new home, (*id.* ¶ 16.j).

Plaintiff claims that based on these representations she decided to accept IBM's offer, (*id.* ¶ 22), but ran into difficulties with her relocation because of IBM's failure to provide her with the promised relocation plan, insofar as the allegedly revised package she received had no

2

provision for an equity advance to provide a down payment on a new house, (*id.* ¶ 24.)  As a result, Plaintiff alleges that she lost the opportunity to bid on a suitable home for her family, incurred higher temporary housing costs than she expected, and was compelled to bid on a "more expensive home further away" from IBM's offices.  (*Id.*)  Plaintiff contends that she complained of the frustrations related to her relocation to Rinner, her then-manager, and Koontz; according to Plaintiff, however, neither individual was concerned.  (*Id.* ¶¶ 25-26.)[1]

    B.  <u>Employment with IBM</u>

Plaintiff started working at IBM on December 1, 2003, as a Senior Contracts Professional.  (*Id.* ¶ 32.)  Plaintiff maintains that throughout her time at IBM her performance was rated at a "2, the second highest rating possible," which was given to only one other individual in her department.  (*Id.* ¶ 40.)  Further, Plaintiff's 2004 review indicated she had "succeeded in getting jobs done where others had failed."  (*Id.*)  Despite Plaintiff's positive ratings she allegedly never received variable pay higher than "several hundred dollars" or any other compensation increases.  (*Id.*)

Plaintiff's medical problems began around the end of May 2005, when she alleges she began to suffer "excruciating and intractable back pain" and was hospitalized for about a week.  (*Id.* ¶ 45.)  After this first hospitalization, she requested to work solely from home, working part-time at first, but increasing to full-time as she recovered.  (*Id.* ¶¶ 46-47.)  Rinner agreed to accommodate Plaintiff's request to work from home, but only if he was permitted to inspect and approve her home work space as suitable.  (*Id.* ¶ 48.)  Plaintiff alleges that IBM did not inspect the homes of any non-disabled employees who worked from home.  (*Id.* ¶¶ 48-49.)  Further,

---

[1] Plaintiff contends that when she told Rinner the relocation package did not include the equity loan provision she was promised, he responded, "Well, it got you here didn't it, so sue us!" (*Id.* ¶ 25.)  When Plaintiff allegedly told Koontz she had incurred more significant relocation costs than she expected, Koontz replied it was "common to lose at least $30,000 in relocating." (*Id.* ¶ 26.)

Rinner told Plaintiff he would require her to use the TOTALS system ("TOTALS") to calculate her work hours if she worked from home part-time. (*Id.* ¶ 50.) According to Plaintiff, TOTALS was set to calculate her hours only on weekdays between 7:00 a.m. and 7:00 p.m. and did not credit any hours worked beyond those prescribed times. (*Id.* ¶ 51.) Any hours Plaintiff took off for rest between 7:00 a.m. to 7:00 p.m. were covered by her short-term disability ("STD") benefit plan, (*id.* ¶ 54), even though Plaintiff alleges she was working more than 40 hours a week by working after 7:00 p.m. and on weekends, (*id.* ¶ 56.)

Plaintiff was hospitalized a second time in November 2005, at which time she was diagnosed with progressive Facet Arthritis, Degenerative Disc Disease, Cervical Stenosis, and Neuropathy in her right hand and leg. (*Id.* ¶ 66.) In November and December 2005, Plaintiff worked only from home, when she was able, (*id.* ¶ 67), and she still received a "2" rating for her 2005 performance, (*id.* ¶ 68.)

By approximately January 2006, Plaintiff was able to resume working on a regular basis from home. (*Id.* ¶ 69.) Plaintiff alleges she requested accommodations that were supported by Medical Treatment Reports from her treating physicians. (*Id.*) Upon Plaintiff's return, Rinner had transferred to another position within IBM, and Lipson was Plaintiff's new supervisor. (*Id.* ¶ 70.) Plaintiff alleges that Lipson told her she had "returned to work in too much acute pain" and "too soon." (*Id.* ¶ 71.)  Lipson also required Plaintiff to continue using TOTALS. (*Id.* ¶ 72.) In early 2006, Plaintiff informed Lipson that TOTALS had not given her a new allotment of STD benefits for 2006, but Defendants did not correct the error. (*Id.* ¶ 73.)

Plaintiff was hospitalized for a third time in mid-March 2006 for further diagnosis and treatment, and upon discharge continued to work from home. (*Id.* ¶ 74.) Plaintiff alleges she told Lipson she needed to begin by working half-time, but would increase to full-time as she

4

recovered. (*Id.*) Lipson, however, gave her a full-time work load, which required Plaintiff to use her STD benefits anytime she took breaks during the work day. (*Id*.) In addition, Plaintiff alleges that beginning around mid-May 2006, Lipson began discriminating against Plaintiff for her disability and/or retaliating against her for requesting accommodations. (*Id.* ¶ 75.) Plaintiff alleges Lipson engaged in various practices designed to punish her (*e.g.*, taking away contracts Plaintiff had substantially completed and giving them to other attorneys, and refusing to sign an agreement Plaintiff had drafted) and embarrass her (*e.g.*, changing her voicemail to say she was "out on STD," rather than "short-term disability"). (*Id.* ¶¶ 75.a, f, h.) Lipson's alleged behavior culminated in a decision to commence an out-of-cycle performance evaluation of Plaintiff, contravening IBM's policy not to do so for an employee who was "performing." (*Id.* ¶ 78-79.)

In response to Lipson's actions, Plaintiff contacted IBM's Human Resources Department ("HR"). (*Id.* ¶ 80.) The HR Vice President, Jarrod Schwartz, told Plaintiff that her only option was to participate in IBM's "Open Door" investigation, so she complied. (*Id.* ¶¶ 81-82.) The investigation concluded that although there were "isolated instances of discrimination," there was "not a hostile environment," and therefore Lipson had not discriminated against Plaintiff. (*Id.* ¶ 83.) Plaintiff contends that after the investigation concluded, Lipson told Plaintiff he was going to give her a final review "with the goal of terminating her." (*Id.* ¶ 84.) On November 14, 2006, Plaintiff went out on her remaining STD, and applied for Long-Term Disability ("LTD") and Social Security Disability. (*Id.* ¶¶ 86-87.) When her STD expired, Plaintiff stayed on LTD leave until her carrier determined she could perform sedentary work and discontinued her benefits. (*Id.* ¶ 90.)

On or around December 1, 2008, Marisa Madori, an IBM HR employee, contacted Plaintiff and told her she would be terminated from IBM unless she returned, based on the LTD

carrier's determination Plaintiff was fit for work.  (*Id.* ¶ 92.)  Madori stated that in order to return, Plaintiff needed to have her treating physician deem her fit to work, (*id.* ¶ 96), but Plaintiff's primary doctors refused to fill out any more forms for IBM, (*id.* ¶ 97.)  Plaintiff's position at IBM had been filled while Plaintiff was out on LTD, so she asked Madori for internal job postings.  (*Id.* ¶ 99.)  Madori informed her she could not access the internal postings until one of Plaintiff's treating physicians determined she was ready to return to work.  (*Id.*)  Plaintiff's doctors did not fill out the forms and, on or around December 16, 2008, Plaintiff was terminated.  (*Id.* ¶ 102.)

      C.  Post-Employment

In or around the fall of 2008, Plaintiff elected her health insurance coverage for 2009 and paid the appropriate premiums.  (*Id.* ¶ 118.)  After her December 2008 termination, Plaintiff elected to continue health coverage for herself and her family as provided by the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. §§ 1161 *et seq.*  (*Id.* ¶ 121.)  The paperwork Plaintiff received regarding her health insurance was allegedly inaccurate and inconsistent.  (*Id.* ¶ 123.)  For example, Plaintiff alleges that some paperwork listed the incorrect date of termination and other paperwork included Plaintiff's deceased son as a policyholder.  (*Id.*)  Furthermore, the paperwork listed varying amounts as the premium.  (*Id.* ¶ 124.)  Plaintiff sought clarification as to the proper amount without success.  (*Id.* ¶¶ 126, 138.)

Plaintiff alleges that despite being assured she had health insurance coverage, there were two occasions on which she was informed her coverage had lapsed.  The first was in December 2008, when her husband went to pick up medication and was advised by the pharmacy that Plaintiff's medical coverage had ceased.  (*Id.* ¶ 128.)  The second occurrence was in January 2009, when Plaintiff elected not to have a test after her physician's office said her coverage had

been denied.  (*Id.* ¶ 133.)  As a consequence of these problems and Plaintiff's failed attempts to clarify the actual cost of her premium, she decided to purchase a different health insurance policy for herself and her family.  (*Id.* ¶ 142.)  Plaintiff alleges this new health insurance policy was insufficient and inadequate.  (*Id.*)

      D.  Procedural History

Plaintiff filed her complaint on April 22, 2009.  (Doc. 1.)  Defendant IBM was added in the First Amended Complaint, filed on November 13, 2009.  (Doc. 12.)  Defendant Lipson was added in the Second Amended Complaint, filed on November 28, 2011.  (Doc. 78.)  Plaintiff's Third Amended Complaint was filed on February 6, 2012, (Doc. 87), and her Fourth Amended Complaint was filed on April 3, 2012, (Doc. 90.)  Defendants served their Motion to Dismiss pursuant to Rules 12(b)(6) and 9(b) on April 18, 2012, (Doc. 92).

## II.   DISCUSSION

      A.     Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal citations and quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-

technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a P armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

In considering whether a complaint states a claim upon which relief can be granted, the court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determine whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).[2]

    B.    Analysis

        1.    *Claim Two – COBRA Benefits*

Plaintiff's second claim, pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) ("Section 502"),[3] is based on IBM's alleged failure to provide her post-employment health insurance benefits. Section 502(a) of ERISA permits the beneficiary of an employee benefit plan to bring a civil action "to recover benefits

---

[2] Because Rule 12(b)(6) motions are addressed to the face of the complaint, *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000), Defendants should have known better than to include in their Memorandum of Law ("Ds' Mem."), (Doc. 94), "facts" that do not appear in and may not be fairly inferred from the FAC. For example, Defendants allege that Plaintiff's supervisor regarded her performance as deficient soon after she began at IBM in December 2003, (Ds' Mem. 2), and that Madori told Plaintiff in November 2008 that IBM required a doctor's note describing the accommodations she would need to return to work, (*id.* at 4, 22.) The Court does not know whether Defendants intended to deceive the Court with these representations, but as they are beyond the four corners of the FAC, Defendants should not have included them in their brief. Counsel only undercut their own credibility by such actions.

[3] Plaintiff advanced two other ERISA claims – Claims Three and Four – under 29 U.S.C. § 1140 (commonly referred to as Section 510), but has withdrawn them. (Plaintiff's Memorandum of Law ("P's Mem."), (Doc. 98), 1.) Those claims are accordingly dismissed with prejudice.

due to [her] under the terms of [her] plan, [and] to enforce [her] rights under the terms of the plan. . . ." 29 U.S.C. § 1132(a)(1)(B).  Plaintiff's claim is based on the inaccurate and inconsistent policy statements she received as well as two occurrences when Plaintiff or her husband was told that coverage was absent.  (FAC ¶¶ 123-24, 128, 133.)  Additionally, Plaintiff alleges that she was entitled to a 35 percent reduction in her insurance premiums pursuant to the American Recovery and Reinvestment Act of 2009 ("ARRA").  (*Id.* ¶¶ 119-20.)  Defendant contends that Plaintiff's second claim should be dismissed because IBM is not the proper defendant, Plaintiff fails to state a claim upon which relief can be granted, and Plaintiff has failed to exhaust the requisite administrative remedies.[4]

"A claim for recovery of benefits under ERISA § 502 (a)(1)B) [*sic*] may be brought only against a covered plan, its administrators or its trustees in their capacity as such." *Williams v. Metro. Life Ins. Co.*, No. 09-CV-280, 2011 WL 1099130, at *3 (W.D.N.Y. Mar. 22, 2011) (dismissing defendant, former employer, where defendant was merely the plan sponsor). "ERISA carefully distinguishes" between the roles of sponsor and administrator.  *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1877 (2011).  Only if an administrator is not designated does the plan sponsor serve as the administrator.  *See* 29 U.S.C. § 1002(16)(A)(ii) ("The term 'administrator' means . . . if an administrator is not so designated, the plan sponsor.").  Although IBM concedes it is the Plan Sponsor, Plaintiff has not alleged either that IBM is the Plan Administrator or that no administrator is designated.  She has thus not plausibly alleged that IBM is a proper defendant on a Section 502(a)(1)(B) claim.

---

[4] In its Reply Memorandum, Defendant also argues that Plaintiff lacks standing to sue.  I will not consider this argument, however, as it was improperly raised for the first time in Defendants' reply brief.  *See Haywin Textile Prods., Inc. v. Int'l Fin. Inv. & Commerce Bank Ltd.*, 137 F. Supp. 2d 431, 434 n.2 (S.D.N.Y. 2001) ("It is well settled that courts should not consider arguments first raised in a party's reply brief which afford no opportunity for response from the opposing party.").

Indeed, Plaintiff failed to address IBM's argument that it is not the proper defendant, and I thus may grant dismissal on that basis alone. *See Martinez v. City of N.Y.*, No. 11-CV-7461, 2012 WL 6062551, at *1 (S.D.N.Y. Dec. 6, 2012) ("A court 'may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.'") (quoting *Lipton v. Cnty. of Orange, N.Y.*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004)); *Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) (collecting cases); *Bonilla v. Smithfield Assocs. LLC*, No. 09-CV-1549, 2009 WL 4457304, at *4 (S.D.N.Y. Dec. 4, 2009) (plaintiff's claim dismissed as abandoned because plaintiff failed to address all arguments defendant made in moving to dismiss that claim).

Even if IBM were a proper defendant, the claim would fail. Plaintiff alleges that a pharmacy and a doctor's office said that Plaintiff did not have coverage. (FAC ¶¶ 128, 133.) Defendants argue that by Plaintiff's own account, IBM repeatedly told her (consistent with her understanding) that she was in fact covered, and that her decision to give up IBM coverage upon receiving incorrect information from third parties cannot be the basis of a Section 502 claim. (D's Mem. 12-13.) Plaintiff wholly fails to address this argument as well, and on this basis alone, the coverage claims are deemed abandoned and dismissed. *See Martinez*, 2012 WL 6062551, at *1; *Robinson*, 2010 WL 5376204, at * 10; *Bonilla*, 2009 WL 4457304, at *4.

In her opposition brief, Plaintiff focuses on her allegation that the benefits notices she received did not conform to United States Department of Labor regulation 29 C.F.R. § 2590.606-4(b)(4)(xi) because they state conflicting amounts in the monthly premium.[5] (P's Mem. 13-14.) Plaintiff alleges that, consequently, she was unable to make an informed decision as to whether

---

[5] This regulation reads, in relevant part: "The notice required by this paragraph . . . shall be written in a manner calculated to be understood by the average plan participant and shall contain the following information . . . [a] description of the amount, if any, that each qualified beneficiary will be required to pay for continuation coverage . . . ." 29 C.F.R. § 2590.606-4(b)(4)(xi).

10

to elect continuation of coverage.  She does not allege that IBM sent the notices and says only, using the passive voice, that "the paperwork [she] received listed different amounts as premiums."  (*See* FAC ¶ 124.)[6]  Further, Plaintiff conceded earlier in this litigation that Fidelity, not IBM, sent the COBRA notices to Plaintiff.  *See* P's Counter 56.1 ¶ 32; *see also Cohan*, 751 F. Supp. 2d at 443 (prior admission in 56.1 statement is binding throughout litigation).  Therefore, Plaintiff has not plausibly alleged that IBM is liable for any alleged conflicting statements the notices may have contained.

Furthermore, Plaintiff's assertion that she was entitled to a 35 percent reduction in her insurance premium pursuant to the ARRA is undercut by her own allegations that she decided to purchase different health insurance coverage for her family at the beginning of February 2009.  (FAC ¶¶ 139, 142.)  As the Defendants correctly point out, Congress only passed the ARRA on February 13, 2009, and the President signed the bill into law on February 17, 2009.  *See* Recovery.Gov, Track the Money, http://www.recovery.gov/About/Pages/The_Act.aspx (last visited March 11, 2013).  ARRA provides, in relevant part:  "In the case of any premium for a period of coverage *beginning on or after the date of the enactment of this Act* . . . ."  ARRA, Pub. L. No. 111-5, § 3001(a)(1)(A), 123 Stat. 455 (emphasis added).  The statute makes clear that it only applies to insurance premiums paid for coverage for a period beginning on or after February 17, 2009.

---

[6] In the FAC, Plaintiff makes only a general allegation, on information and belief, that health coverage and benefits were handled by the IBM Employee Services Center ("ESC"), which, on information and belief, was staffed by IBM personnel.  (FAC ¶ 117.)  Earlier in this litigation, however, Plaintiff admitted that the IBM ESC consisted of Fidelity Employer Services Company, LLC ("Fidelity") phone representatives that IBM plan participants could contact to help them with questions.  (*See* Plaintiff Susan Amy Schlenger's Local Rule 56.1 Counter-Statement/Supplemental Statement of Material, Undisputed Facts in Opposition to Fidelity's Motion for Summary Judgment and for an Award of Attorney's Fees and Costs, ("P's Counter 56.1), (Doc. 54), ¶ 11.)  Her new allegation is therefore insufficient to overcome her judicial admission.  *See Cohan v. Movtady*, 751 F. Supp. 2d 436, 443 (E.D.N.Y. 2010) ("[P]arties are bound by their concessions in Rule 56.1 Statements.") (citing *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) ("acts admitted by a party are judicial admissions that bind th[at] [party] throughout th[e] litigation")).

Plaintiff alleges that at the beginning of February 2009, she received a letter from IBM indicating she owed money for her January and February premiums. (FAC ¶ 139.) It was at this point that Plaintiff chose to terminate her IBM-sponsored health insurance coverage. (*Id.*) She does not allege that she paid the premium sought for January and February or that she paid a premium for any period beginning after February 17, 2009. Accordingly, Plaintiff's claim that she was not offered a reduction in her premium cannot stand, as she was not eligible to receive a reduction under the ARRA. Furthermore, an individual who does not elect COBRA coverage is not an "assistance eligible individual" under the Act. ARRA, Pub. L. No. 111-5, § 3001(a)(3)(B), 123 Stat. 455 ("For purposes of this section, the term 'assistance eligible individual' means any qualified beneficiary if . . . such qualified beneficiary elects such coverage. . . ."). Thus, having failed to allege that she elected COBRA coverage after February 17, 2009, and apparently having discontinued her COBRA coverage and elected new health insurance, Plaintiff was not eligible to receive a reduction.

As Plaintiff has failed to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), I grant Defendants' Motion to Dismiss with respect to Claim Two.[7]

2. *Claims One and Five through Nine – Fraudulent Inducement and NYSHRL Claims*

A federal court may exercise supplemental jurisdiction over state-law claims "that are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). A district court may decline to exercise its

---

[7] I need not reach whether Plaintiff has exhausted administrative remedies, as the claim is being dismissed on other grounds.

supplemental jurisdiction where all claims over which the court has original jurisdiction have been dismissed. *See id.* § 1367(c)(3).

Following dismissal of Plaintiff's ERISA claims over which the Court had original jurisdiction, the Court has discretion to assert supplemental jurisdiction over the fraudulent inducement and New York State Human Rights Law claims, and must balance judicial economy, convenience, fairness, and comity in exercising this discretion. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988). As here, where "[t]here is no diversity between the parties," and "[d]iscovery has not yet begun," considerations of "[c]onvenience and comity weigh heavily against this Court retaining jurisdiction." *Cintas Corp. v. Unite Here*, 601 F. Supp. 2d 571, 581 (S.D.N.Y. 2009). Further, "[w]hen the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie-Mellon*, 484 U.S. at 350 (footnote omitted). Indeed, it is appropriate to decline to exercise supplemental jurisdiction when the federal claims are dismissed any time before trial, *see Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006), and this Court routinely does so. I therefore decline to exercise supplemental jurisdiction over Plaintiff's fraudulent inducement and NYSHRL claims.

       3.     *Leave to Amend*

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). It is within the sound discretion of the district court to grant or deny leave to amend. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). I decline to *sua sponte* grant Plaintiff leave to amend the FAC.

Plaintiff, a lawyer herself, has already – with the assistance of three different lawyers – attempted five times over almost four years to state valid federal claims based on events that occurred more than four years ago. *See Gabriele v. Am. Home Mortg. Servicing, Inc.*, No. 12-CV-985, 2012 WL 5908601, at *7 (2d Cir. Nov. 27, 2012) (summary order) (district court did not abuse discretion where plaintiff had amended his complaint three times and further amendments would be futile); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted); *see also Ruotolo*, 514 F.3d at 191 (affirming denial of leave to amend "given the previous opportunities to amend").

Further, Plaintiff has not requested leave to file a Fifth Amended Complaint or otherwise suggested that she is in possession of facts that could cure the pleading deficiencies identified above. Accordingly, I decline to grant Plaintiff leave to amend *sua sponte* with respect to the

dismissed claims. *See, e.g.*, *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (no error in failing to grant leave to amend where it was not sought); *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 n.7 (2d Cir. 1980) ("[A]ppellants never sought leave to amend their complaint either in the district court or as an alternative form of relief in this court after [appellee] raised the issue of the sufficiency of appellants' complaint. Accordingly, we see no reason to grant such leave *sua sponte*."); *see also Ridley v. Deutsche Bank Nat'l Trust Co.*, 453 B.R. 58, 77 (Bankr. E.D.N.Y. 2011) ("Where previous amendments were allowed, a court need not *sua sponte* allow further opportunities to amend where no further attempt to amend the complaint is sought.") (alteration and quotation marks omitted);

### III.   CONCLUSION

For the foregoing reasons, Plaintiff's federal claims are dismissed with prejudice, and I decline to exercise supplemental jurisdiction over the remaining state-law claims, which are dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 92), and close the case.

**SO ORDERED.**

Dated:  March 12, 2013
         White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.